67 F.3d 484
 104 Ed. Law Rep. 28, 13 A.D.D. 338
 W.B., Parent of the Minor, E.J., on her own behalf and on
behalf of her son, E.J., Appellants,
v.
Joan MATULA; Mary Angela Engelhardt; Judy Beach;
Catherine Brennan; Patricia Cericola; Dr. Gary Danielson;
Ann Pearce; Kathleen Mahony; Carol Burns; Florence
Noctor; Dr. Jeffrey Osowski; New Jersey State Board of
Education; Warren County Department of Education; Mary Lou
Varley; Mansfield Board of Education; State of New Jersey;
Department of Education Division of Special Education;
Employees of the Mansfield Township Board of Education.
 No. 95-5033.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 22, 1995.
Decided Oct. 17, 1995.
 
 Rebecca K. Spar (argued), Cole, Schotz, Meisel, Forman & Leonard, P.A., Hackensack, NJ, for Appellants.
 David A. Wallace (argued), Hackettstown, NJ, for Appellees.
 Before GREENBERG, COWEN, and SAROKIN, Circuit Judges.
 OPINION OF THE COURT
 SAROKIN, Circuit Judge:
 
 
 1
 Plaintiff, on behalf of her disabled child, seeks damages for the persistent refusal of certain school officials to evaluate, classify and provide necessary educational services. The matter was dismissed by the district court on the grounds that a settlement of the administrative proceeding barred pursuit of the claims for damages. We conclude that the settlement agreement was not susceptible to summary disposition. Indeed, we question the propriety of demanding and receiving a release of such claims in exchange for providing services to which a disabled child is otherwise entitled. However, since the settlement agreement did not clearly waive such claims, we do not determine whether such a waiver would be against public policy. We do conclude that the agreement does not bar such claims as a matter of law, and therefore reverse and remand the matter for trial.
 
 
 2
 Plaintiff brought suit pursuant to 42 U.S.C. Sec. 1983, Sec. 504 of the Rehabilitation Act of 1973, and the Individuals with Disabilities Education Act against school officials, alleging that the child was deprived of his right to a free, appropriate public education, in violation of the U.S. and New Jersey Constitutions and federal and state statutes and regulations. Despite resistance by school officials and following extensive administrative proceedings, the mother ultimately succeeded in having her child evaluated, classified as neurologically impaired and provided with special education services. Plaintiffs then sued for compensatory and punitive damages incurred in the period before the school agreed to provide these services. The district court granted summary judgment in favor of all defendants on all claims predicated upon a settlement of the administrative proceeding. We will affirm in part, reverse in part, and vacate in part.
 
 I.
 
 3
 Plaintiff W.B. and her minor child, plaintiff E.J., moved to Hackettstown, New Jersey during the summer of 1991. W.B.'s requests for special educational services for E.J., defendants' alleged resistance to these requests, and the damages arising from this alleged resistance, occurred while E.J. was in the first and second grades. We will recount these events in some detail. While some of the facts may be in dispute, most are not, and in any event, in view of the procedural posture of the case, we recite the facts from the viewpoint of the plaintiffs.
 
 
 4
 Before the start of school in the fall of 1991, W.B. met with defendant Joan Matula, principal of the Mansfield Township Elementary School ("the school"), to discuss her concerns about E.J.'s behavioral problems, including touching and hitting other children. W.B. also completed forms at the school in which she stated that E.J. had received speech therapy.
 
 
 5
 E.J. entered the first grade in September 1991 and was placed in a class taught by defendant Mary Angela Engelhardt. Engelhardt soon reported that E.J. exhibited a variety of disruptive behaviors, including not paying attention in class, fighting with other students, failing to remain seated, making continuous noises and repeatedly touching other children. The teacher also observed that E.J. had difficulty beginning tasks, finishing those he did start and coloring within the lines. In addition, throughout the school year E.J. urinated and defecated in his pants. In October the school nurse, defendant Florence Noctor, told W.B. that other children were teasing E.J. because of his "bathrooming problem." Moreover, within the first few weeks of school, Engelhardt informed W.B. that E.J. might have Attention Deficit Disorder/Attention Deficit Hyperactivity Disorder ("ADHD"), a condition with which W.B. was unfamiliar.
 
 
 6
 In October, W.B. met with Engelhardt and defendant Carol Burns, Chief School Administrator and the person responsible for compliance with the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. Sec. 1400 et seq. and Sec. 504 of the Rehabilitation Act ("Sec. 504"), 29 U.S.C. Sec. 794. The group discussed E.J.'s behavioral and academic problems, but no defendant referred E.J. for an evaluation or special education services, nor did anyone inform W.B. of E.J.'s possible entitlement to such services. The same month E.J. began to see Dr. Lee Monday, a private therapist.
 
 
 7
 After reading about ADHD later in the fall, W.B. raised it to Dr. Monday, who then diagnosed E.J. as having ADHD. W.B. also spoke with Matula and Engelhardt and sent them literature about the disorder. In December W.B. wrote them explaining that she believed E.J.'s behavioral and academic problems were attributable to ADHD and specifically requested that E.J. be permitted to spend additional time with the school's Resource Team.
 
 
 8
 The first actual dispute between the parties concerned evaluation. W.B. asked the school to refer E.J. to the Mansfield Child Study Team ("CST") for evaluation;[1] the school refused, but finally agreed after W.B. persuaded Matula, Engelhardt, Burns, and Catherine Brennan, director of the CST,[2] to meet in February 1992 with her, Dr. Monday, and a social worker whom Brennan had agreed to let observe E.J. in the classroom. Brennan had believed that ADHD did not qualify a child for special services under IDEA or Sec. 504, but when W.B. showed her a memorandum from the Assistant Secretary of the U.S. Department of Health and Human Services to the contrary, Brennan relented and approved the CST evaluation.
 
 
 9
 In April 1992, the CST determined that E.J. had ADHD and was eligible for Sec. 504 services. However, because E.J.'s academic performance was at or above grade level, the CST concluded he was not classifiable under IDEA and therefore not eligible for those services offered under IDEA but not the Rehabilitation Act. The CST concluded:
 
 
 10
 [E.J.] has developed academic skills in the areas of reading, mathematics and written language that are at or above his current grade placement. He is, therefore, not eligible for special education services.... However, the comprehensive Child Study Team evaluation does identify the presence of [ADHD].... For this reason, [E.J.] is considered to be a handicapped person under Section 504 of the Rehabilitation Act of 1973.
 
 
 11
 Appendix ("App.") at 98. Though one examining physician on the CST recommended a speech evaluation, audiometry, and tympanometry, these suggestions were not included in the CST report.
 
 
 12
 Despite the CST finding that E.J. suffered from ADHD and was thus entitled to Sec. 504 services, defendants did not begin providing them. Concerned that the CST evaluation had not fully assessed E.J., W.B. asked defendants to fund an independent evaluation. Defendants refused.
 
 
 13
 In June 1992, W.B. initiated her first IDEA administrative proceeding before the New Jersey Office of Administrative Law ("OAL"), seeking an independent evaluation of E.J., his classification as neurologically impaired (a status which would render him eligible for IDEA services), development of an Individual Education Plan ("IEP"), and costs and fees. We will refer to this proceeding as "E.J. I." In July 1992, on the date of the E.J. I hearing, respondent Mansfield Board of Education ("the Board" or "Mansfield") signed a consent order agreeing to an independent evaluation and adjourning the hearing on the balance of W.B.'s petition.
 
 
 14
 The independent evaluation took place soon thereafter. According to ALJ McGill, who heard the first and all subsequent petitions between W.B. and the Board, the evaluation
 
 
 15
 was very significant because the determination was made for the first time that E.J. had Tourette's syndrome and a severe form of obsessive-compulsive disorder in addition to ADHD. Thus, W.B. was substantially correct in her belief that the evaluation by the Mansfield CST did not properly identify E.J.'s problems.
 
 
 16
 E.J. v. Mansfield, OAL Dkt Nos. EDS 11659-93/11798-93, Sept. 1, 1994 ("E.J. IV "), at 49.
 
 
 17
 In September 1992 E.J. entered the second grade, joining a class taught by defendant Judy Beach, but his problems continued. Defendants were still not providing Sec. 504 services.
 
 
 18
 As to classification, despite the findings of the independent evaluation, in November the CST concluded that E.J. was perceptually impaired but not neurologically impaired. The distinction is important, because the former classification would result in a lower level of IDEA services for E.J. than the latter. W.B. attempted to persuade the school to reclassify her son as neurologically impaired, and in December 1992, Mansfield cross-petitioned to have E.J. classified as perceptually impaired.[3]
 
 
 19
 In April 1993, after nearly ten days of hearings, W.B. and the Board entered into a settlement stipulating that, as W.B. had sought, E.J. would be classified as neurologically impaired. The stipulation also incorporated a thirty-page IEP that extended through the 1993-94 school year and provided for $14,000 for W.B. for attorneys fees and costs. ALJ McGill approved the settlement, E.J. v. Mansfield Board of Education, OAL Dkt. Nos. 5192-92/10038-92, 1993 WL 557646, April 12, 1993 ("E.J. I "), and later observed that "the settlement was consistent with the overwhelming weight of the evidence.... [I]t would appear that W.B. was substantially correct on the question of classification." E.J. IV at 49-50. E.J. had nearly completed second grade.
 
 
 20
 More administrative proceedings followed,[4] culminating in a final round of petitions filed in November and December 1993. These too were consolidated and referred to ALJ McGill, who held hearings for twenty-seven days, and on September 1, 1994 issued a fifty-four page opinion ordering the Board to (1) place E.J. in a private school at the Board's expense; (2) pay prospectively for E.J.'s sessions with the private therapist, Dr. Monday; (3) reimburse W.B. for the cost of an independent learning disability evaluation of E.J. which the Board had refused to provide; and (4) provide a supplemental occupational therapy evaluation. E.J. IV at 54. The ALJ McGill's final paragraph is instructive:
 
 
 21
 This decision would not be complete without a comment on Mansfield's seemingly endless attacks on the parent, W.B. Evidently, Mansfield believes not only that W.B. is overly persistent, but also that she is trying to wear down the district to obtain services to which E.J. is not entitled. In my view, however, W.B. was essentially correct about the major points in dispute in these proceedings including evaluation, classification and placement. Nonetheless, the district has consistently denied W.B.'s reasonable, appropriate, and meritorious requests related to E.J.'s education. The basic dynamic of this entire dispute is that the district has denied W.B.'s meritorious requests and W.B. has been left with no alternative to an enormously burdensome struggle in order to obtain E.J.'s rights under IDEA. In my view, the burden placed on W.B. was unnecessary, unwarranted and largely the product of the district's unwillingness to recognize and appreciate E.J.'s neurological impairments despite ample reliable evidence thereof.
 
 
 22
 E.J. IV at 54. According to plaintiffs, Mansfield has appealed E.J. IV to the district court.
 
 The instant action
 
 23
 W.B. commenced this proceeding in July 1993, several months after the Board settled E.J. I by classifying E.J. as neurologically impaired and approving an IEP. The complaint alleged causes of action directly under Sec. 504; causes pursuant to 42 U.S.C. Sec. 1983 for violations of procedural due process, the equal protection clause, and rights secured by IDEA, its regulations, Sec. 504, and state statutes; causes pursuant to 42 U.S.C. Sec. 1985; and causes directly under the New Jersey Constitution and statutes. W.B. sought compensatory and punitive damages for defendants' failure to provide E.J. a free, appropriate public education.
 
 
 24
 The district court consolidated the action with W.B.'s appeal of E.J. III. After the parties consented or stipulated to the dismissal of a number of defendants, those remaining in the case were Matula, the principal; Engelhardt, E.J.'s first grade teacher; Beach, his second grade teacher; Brennan, director of the CST; Burns, the school administrator; and Noctor, the school nurse, as well as Dr. Gary Danielson, the school psychologist and a member of the CST; Patricia Cericola, a speech and language therapist and member of the CST; and Ann Pearce, a learning disability teacher consultant and member of the CST. W.B. sued these nine persons in their official and individual capacities.
 
 
 25
 The remaining defendants moved to dismiss, contending that (a) the settlement agreement in E.J. I barred this action and (b) plaintiffs had failed to exhaust their administrative remedies concerning claims not covered by the settlement agreement. On July 27, 1994, the district court treated the motion as one for summary judgment and denied it. The court concluded that the settlement agreement did not "unambiguously bar" the federal action and that further administrative proceedings would be futile because "W.B. has already obtained all the relief an ALJ is able to grant." W.B. v. Matula, No. 93-3124, slip op. (D.N.J. July 27, 1994) ("W.B. I ") at 7. The district court also asked the parties to file motions for summary judgment "on the merits of Plaintiff's claims." Id.
 
 
 26
 Defendants then moved to dismiss or in the alternative for reconsideration of the district court's July 1994 order, reasserting their arguments regarding the settlement agreement and exhaustion and adding arguments that defendants enjoy qualified immunity and that plaintiffs had failed to allege colorable claims. Defendants also sought dismissal of the conspiracy count and the pendent state claims.
 
 
 27
 Reversing itself, the district court vacated its prior order and entered summary judgment in favor of defendants, now reasoning that the E.J. I settlement agreement "unambiguously provides for the full resolution of the dispute between the parties." W.B. v. Matula, No. 93-3124, slip op. (D.N.J. December 13, 1994) ("W.B. II ") at 4. The district court did not reach defendants' exhaustion argument.
 
 
 28
 The district court had subject matter jurisdiction pursuant to 28 U.S.C. Secs. 1331, 1343, and 1367. Plaintiffs filed a timely notice of appeal, and we have jurisdiction pursuant to 28 U.S.C. Sec. 1291.
 
 II.
 
 29
 Some preliminary discussion of the legislation involved is necessary to an analysis of the district court's opinion and judgment.
 
 A. IDEA
 
 30
 In 1975 Congress appropriated federal funds for state special education programs but made them available on the condition that states implement policies assuring a "free appropriate public education" for all their disabled children. 20 U.S.C. Sec. 1412(1). Known then as the Education of the Handicapped Act ("EHA") and today as IDEA,[5] the law was passed "to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. Sec. 1400(c). A free, appropriate public education "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." Board of Education v. Rowley, 458 U.S. 176, 188-89, 102 S.Ct. 3034, 3041-42, 73 L.Ed.2d 690 (1982).
 
 
 31
 Among the specific conditions a state must satisfy is the requirement that it demonstrate that "all children residing in the State who are disabled, regardless of the severity of their disability, and who are in need of special education and related services are identified, located, and evaluated." 20 U.S.C. Sec. 1412(2)(C). See also 20 U.S.C. Sec. 1414(a)(1)(A); 34 C.F.R. Secs. 300.128(a)(1) and note 1, 300.220 and note, 300.300 note 3; N.J.A.C. 6:28-3.2. This is known as the "child find" duty.
 
 
 32
 The primary mechanism for delivering a free appropriate education is the development of a detailed instruction plan, known as an Individual Education Program ("IEP"), for each child classified as disabled. 20 U.S.C. Sec. 1401(18). To the extent possible, however, a school must "mainstream" disabled students--that is instruct them in a regular, not special, education setting. 20 U.S.C. Sec. 1412(5).
 
 
 33
 In addition to authorizing federal reviews of state and local compliance with IDEA, see 34 C.F.R. Secs. 104.61, 100.7, IDEA's provisions are enforced by affording certain procedural safeguards to parents. Parents may examine all relevant records concerning evaluation and placement of their children, 20 U.S.C. Sec. 1415(b)(1)(A); must receive prior written notice when a school proposes or refuses to alter a placement, Sec. 1415(b)(1)(C); may contest in an impartial due process hearing decisions regarding the education of their disabled child, Secs. 1415(b)(1)(E), (2); and may obtain judicial review of an administrative decision, Sec. 1415(e)(2). See Bernardsville Bd. of Educ. v. J.H., 42 F.3d 149, 158 & n. 13 (3d Cir.1994); Lester H. v. Gilhool, 916 F.2d 865, 869 (3d Cir.1990), cert. denied, 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991).
 
 
 34
 New Jersey fulfills its IDEA obligations through a complex statutory and regulatory scheme codified at N.J.S.A. Secs. 18A:46-1 et seq. and N.J.A.C. 6:28-1 et seq. The state requires that "[e]ach district board of education shall provide a free, appropriate public education program and related services for pupils with educational disabilities." N.J.A.C. 6:28-2.1(a). The state specifically requires that district boards of education identify students within their district "who may be educationally disabled and who are not receiving special education and/or related services." N.J.A.C. 6:28-3.2(a). W.B. relied upon this scheme in her efforts to compel Mansfield and the school to discharge its IDEA duties, including the proper evaluation, classification, and placement of E.J.
 
 B. Rehabilitation Act of 1973
 
 35
 While IDEA is phrased in terms of a state's affirmative duty to provide a free, appropriate public education, the Rehabilitation Act is worded as a negative prohibition against disability discrimination in federally funded programs. The latter provides:
 
 
 36
 No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....
 
 
 37
 29 U.S.C. Sec. 794(a). We will refer to this provision as "Sec. 504."
 
 
 38
 To establish a violation of Sec. 504, plaintiffs must demonstrate that (1) E.J. is disabled as defined by the Act; (2) E.J. is "otherwise qualified" to participate in school activities; (3) the school or the Board receives federal financial assistance; and (4) E.J. was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1380 (3d Cir.1991); 34 C.F.R. Sec. 104.4(a). In addition, to be liable, defendants "must know or be reasonably expected to know of" E.J.'s disability. Nathanson, 926 F.2d at 1381. However, plaintiffs "need not establish that there has been an intent to discriminate in order to prevail under Sec. 504." Id. at 1384. See Alexander v. Choate, 469 U.S. 287, 297, 105 S.Ct. 712, 718, 83 L.Ed.2d 661 (1985).
 
 
 39
 There appear to be few differences, if any, between IDEA's affirmative duty and Sec. 504's negative prohibition. Indeed, the regulations implementing Sec. 504 adopt the IDEA language, requiring that schools which receive or benefit from federal financial assistance "shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction." 34 C.F.R. Sec. 104.33(a). To the extent particular provisions of IDEA and Sec. 504 differ, they will be discussed below. With this background, we now review the specific action taken by the district court.
 
 III.
 
 40
 Our review of an order granting summary judgment is plenary. American Medical Imaging Corp. v. St. Paul Fire & Marine Ins. Co., 949 F.2d 690, 692 (3d Cir.1991). Summary judgment is appropriate when there are no issues of material fact presented in admissible form and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir.1987). In determining whether a genuine issue of fact exists, we resolve all reasonable doubts in favor of the nonmoving party. Fagan v. City of Vineland, 22 F.3d 1296, 1299 (3d Cir.1994) (in banc).
 
 
 41
 Because it is jurisdictional in nature, we begin with defendants' contention that dismissal of all claims was appropriate because plaintiffs failed to exhaust their administrative remedies. Essential to their reasoning is the assertion that damages are unavailable in a Sec. 1983 action premised on IDEA violations. Plaintiffs reply that damages are available in this action, and because an ALJ is not authorized to order compensatory damages, further resort to administrative proceedings would be futile. In its first decision the district court rejected defendants' exhaustion argument, and when it subsequently reversed itself on the grounds that the settlement agreement barred this action, the district court did not revisit exhaustion.
 
 A. Section 1983 right of action
 
 42
 Section 1983 does not confer substantive rights, but merely redresses the deprivation of those rights elsewhere secured. Those rights may be created by the Constitution or federal statute, and hence in a Sec. 1983 action a person may challenge federal statutory violations by state agents. Maine v. Thiboutot, 448 U.S. 1, 5-6, 100 S.Ct. 2502, 2504-05, 65 L.Ed.2d 555 (1980) ("Sec. 1983 encompasses claims based on purely statutory violations of federal law").
 
 
 43
 When the rights at issue are statutory, however, a Sec. 1983 action is impermissible when "Congress intended to foreclose such private enforcement." Wright v. Roanoke Redevelopment & Housing Authority, 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987). Such an intent is generally found either in the express language of a statute or where a statutory remedial scheme is so comprehensive that an intent to prohibit enforcement other than by the statute's own means may be inferred. Id.
 
 
 44
 Relying on the latter exception, in 1984 the Supreme Court held that when EHA, Sec. 504, and Equal Protection Clause claims overlap, EHA procedures are the exclusive means by which parents and children can secure a free appropriate education. Smith v. Robinson, 468 U.S. 992, 1012-13, 104 S.Ct. 3457, 3468-69, 82 L.Ed.2d 746 (1984). In response to Smith, however, Congress amended the EHA to add Sec. 1415(f), a provision which establishes that the statute's provisions are not the sole means for redress available to disabled children and their parents.[6] See The Handicapped Children's Protection Act of 1986, Pub.L. No. 99-372 Sec. 3, 100 Stat. 796 (1986).
 
 
 45
 In enacting Sec. 1415(f), Congress specifically intended that EHA violations could be redressed by Sec. 504 and Sec. 1983 actions, as the legislative history reveals. The Senate Report discussed Smith at length, including quoting favorably from the Smith dissent, see S.Rep. No. 99-112, 99th Cong., 2d Sess. (1986), reprinted in 1986 U.S.C.C.A.N. 1798, 1799 ("Senate Report"). The House Conference Report stated "[i]t is the conferees' intent that actions brought under 42 U.S.C. 1983 are governed by [Sec. 1415(f) ]." H.R.Conf.Rep. No. 99-687, 99th Cong., 2d Sess. (1986); 1986 U.S.C.C.A.N. 1807, 1809. In addition, the House Report made explicit that "since 1978, it has been Congress' intent to permit parents or guardians to pursue the rights of handicapped children through EHA, section 504, and section 1983.... Congressional intent was ignored by the U.S. Supreme Court when ... it handed down its decision in Smith v. Robinson." H.R.Rep. No. 99-296, 99th Cong., 1st Sess. 4 (1985) ("House Report") (first emphasis added). Section 1415(f) was thus enacted to "reaffirm, in light of [Smith ], the viability of section 504, 42 U.S.C 1983, and other statutes as separate vehicles for ensuring the rights of handicapped children." Id.
 
 
 46
 We have previously characterized the enactment of Sec. 1415(f) as overruling Smith. See Board of Education v. Diamond, 808 F.2d 987, 994-95 (3d Cir.1986). Far from inferring a congressional intent to prevent Sec. 1983 actions predicated on IDEA then, we conclude that Congress explicitly approved such actions. Accordingly, Sec. 1983 supplies a private right of action for the instant case.
 
 B. Availability of damages
 1. Under Sec. 504
 
 47
 We begin with the Supreme Court's recent reminder that we should not confuse the availability of a private right of action with the availability of various remedies. "[A]lthough we examine the text and history of a statute to determine whether Congress intended to create a right of action, we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 66, 112 S.Ct. 1028, 1032, 117 L.Ed.2d 208 (1992) (citation omitted) (monetary damages available as remedy in action to enforce Title IX). The Court went on to announce the "general rule" that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." Id. at 70-71, 112 S.Ct. at 1035-36.
 
 
 48
 Since Franklin, one court of appeals has concluded that "money damages are available under Sec. 504." Rodgers v. Magnet Cove Public Schools, 34 F.3d 642, 645 (8th Cir.1994). See also Lue v. Moore, 43 F.3d 1203, 1205 (8th Cir.1994) (same). The Eighth Circuit reasoned that the Rehabilitation Act incorporates the remedies of Title VI of the Civil Rights Act of 1964, Title IX is also modeled after Title VI, and thus "the Court's holding on Title IX in Franklin applies equally to Title VI and Section 504 cases." Rodgers, 34 F.3d at 644. See 29 U.S.C. Sec. 794a(a)(2). We agree, and thus hold that plaintiffs may seek monetary damages directly under Sec. 504, as well as the Sec. 1983 claim predicated on Sec. 504.
 
 2. Under IDEA
 
 49
 Beginning with the "traditional presumption in favor of all appropriate relief," Franklin, 503 U.S. at 69, 112 S.Ct. at 1034, we turn to the language and history of Sec. 1983 and IDEA. First, it is axiomatic that Sec. 1983 provides for remedies "at law ... [or] in equity." 42 U.S.C. Sec. 1983.
 
 
 50
 Second, even were we to limit our focus to IDEA itself, we discern nothing in the text or history suggesting that relief under IDEA is limited in any way, and certainly no "clear direction" sufficient to rebut the presumption that all relief is available. The expansive language of Sec. 1415(f), which was enacted in the shadow of Smith and tracks the broad grant of remedial power allowed a district court reviewing a direct IDEA appeal, see 20 U.S.C. Sec. 1415(e)(2), contains no restrictions on forms of relief. Nor does the legislative history of Sec. 1415(f) suggest a congressional intent that damages be unavailable. In fact, Congress expressly contemplated that the courts would fashion remedies not specifically enumerated in IDEA. See House Report at 7 (excusing Sec. 1415(f) exhaustion requirement where "the hearing officer lacks the authority to grant the relief sought").
 
 
 51
 Indeed, since enactment of Sec. 1415(f), several courts of appeals have approved Sec. 1983 actions to enforce IDEA rights. See Angela L. v. Pasadena Independent Sch. Dist., 918 F.2d 1188, 1193 n. 3 (5th Cir.1990) (Sec. 1983 and Sec. 504 "permit parents to obtain relief which otherwise is unavailable from the EHA"); Digre v. Roseville Sch. Independent Dist., 841 F.2d 245, 250 (8th Cir.1988) (injunctive relief); Mrs. W. v. Tirozzi, 832 F.2d 748, 753 (2d Cir.1987) (declaratory and injunctive relief); Jackson v. Franklin County Sch. Bd., 806 F.2d 623, 631-32 (5th Cir.1986) (compensatory damages or remedial education). See also Hunt v. Bartman, 873 F.Supp. 229, 245 (W.D.Mo.1994) (injunctive relief). On the other hand, the Sixth Circuit has indicated skepticism that damages are available in a Sec. 1983 action asserting violations of IDEA. See Crocker v. Tennessee Secondary Sch. Athletic Ass'n, 980 F.2d 382, 386-87 (6th Cir.1992) (disabled transfer student, who was ruled ineligible to participate in school sports and missed two games, did not state a claim for damages under EHA).
 
 
 52
 Even before Franklin, in a Sec. 1983 action to enforce IDEA, we held that compensatory damages are available to remedy IDEA violations. Diamond, 808 F.2d at 996. See also Lester H., 916 F.2d at 873 (in direct appeal from IDEA administrative proceeding, "Congress empowered the courts to grant a compensatory remedy"); Muth v. Central Bucks Sch. Dist., 839 F.2d 113, 127 (3d Cir.1988) ("there is case law suggesting that compensatory damages based solely on violations of a parent's procedural rights may be available under the EHA"), rev'd on other grounds, 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989); Woods v. New Jersey Dep't of Educ., 796 F.Supp. 767, 774, 776 (D.N.J.1992) (compensatory and punitive damages available in Sec. 1983 action for IDEA violations).
 
 
 53
 We conclude that the traditional presumption in favor of all appropriate relief is not rebutted as to Sec. 1983 actions to enforce IDEA. Defendants have identified no "clear direction" in the text or history of IDEA indicating such a limitation, and indeed there is strong suggestion that Congress intended no such restriction. Certainly the plain language of Sec. 1983 authorizes actions at law or equity, and our prior holding in Diamond compels the conclusion that, as a matter of law, an aggrieved parent or disabled child is not barred from seeking monetary damages in such an action.
 
 
 54
 We caution that in fashioning a remedy for an IDEA violation, a district court may wish to order educational services, such as compensatory education beyond a child's age of eligibility, or reimbursement for providing at private expense what should have been offered by the school, rather than compensatory damages for generalized pain and suffering. See Lester H., supra; Puffer v. Raynolds, 761 F.Supp. 838, 853 (D.Mass.1988); Jackson, 806 F.2d at 632 (in Sec. 1983 action alleging IDEA violations, "remedial educational services may be more valuable than any pecuniary damages that could be awarded"). However, we do not preclude the awarding of monetary damages and leave to the district court in the first instance the task of fashioning appropriate relief.
 
 C. Exhaustion
 
 55
 IDEA requires that "before the filing of a civil action ... seeking relief that is also available under this subchapter," a plaintiff must exhaust the IDEA procedures. 20 U.S.C. Sec. 1415(f) (emphasis added). Where recourse to IDEA administrative proceedings would be futile or inadequate, however, the exhaustion requirement is excused. See Lester H., 916 F.2d at 869. See also Honig v. Doe, 484 U.S. 305, 326-27, 108 S.Ct. 592, 605-06, 98 L.Ed.2d 686 (1988).
 
 
 56
 Preliminarily, we observe that the exhaustion requirement may not be circumvented by casting an IDEA claim as a Sec. 1983 action predicated on IDEA. See Foster v. Wyrick, 823 F.2d 218, 221 (8th Cir.1987) (plaintiff may not avoid Title VII exhaustion requirement "by utilizing Sec. 1983 as the vehicle for asserting his Title VII claim"). See also House Report at 7 ("parents alleging violations of section 504 and 42 U.S.C. 1983 are required to exhaust administrative remedies before commencing separate actions in court where exhaustion would be required under EHA").
 
 
 57
 Beginning with the plain language of Sec. 1415(f), see note 6, supra, it is apparent that the exhaustion requirement is limited to actions seeking relief "also available" under IDEA. We held supra that damages are available in a Sec. 1983 action, but IDEA itself makes no mention of such relief. Hence by its plain terms Sec. 1415(f) does not require exhaustion where the relief sought is unavailable in an administrative proceeding.
 
 
 58
 Moreover, the legislative history of Sec. 1415(f) clarifies that "[e]xhaustion of EHA administrative remedies would ... be excused where ... resort to those proceedings would be futile." Senate Report, 1986 U.S.C.C.A.N. at 1805. See also House Report at 7 (recourse to administrative remedies futile where "the hearing officer lacks the authority to grant the relief sought").
 
 
 59
 Accordingly, we have held that, where the relief sought in a civil action is not available in an IDEA administrative proceeding, recourse to such proceedings would be futile and the exhaustion requirement is excused. See Lester H., 916 F.2d at 870 (exhaustion excused where relief sought, compensatory education, unavailable in EHA administrative proceedings); 20 U.S.C. Sec. 1415(f). See also Straube v. Florida Union Free School District, 778 F.Supp. 774, 779 (S.D.N.Y.1991) (exhaustion excused in IDEA civil action where relief sought, placement in unapproved residential program, unavailable in administrative proceedings); Honig v. Doe, 484 U.S. at 326-27, 108 S.Ct. at 605-06.
 
 
 60
 In the matter before us, it would be futile, perhaps even impossible, for plaintiffs to exhaust their administrative remedies because the relief sought by plaintiffs in this action was unavailable in IDEA administrative proceedings. We have some reservations about whether the administrative tribunal would even be competent to hear plaintiff's IDEA claim since any rights that can be had have already been settled, and both parties are required to adhere to that settlement agreement. There may be other very narrow exceptions permitting the exhaustion requirement to be waived before filing a Sec. 1983 claim, such as where the parents of a deceased child seek damages for a school board's failure to provide IDEA services while the child was still alive. Such exceptions, whether based on futility or other grounds, would be rare indeed.
 
 
 61
 We note that a second rationale for excusing exhaustion, identified in Lester H., is also present here. In Lester H., we pointed out that IDEA mandates resort in the first instance to administrative hearings so as to develop the factual record and resolve evidentiary disputes concerning, for example, evaluation, classification, and placement. Lester H., 916 F.2d at 869-70. Here, E.J.'s classification and placement have been resolved in the numerous proceedings before ALJ McGill. The factual record has been developed and an action seeking compensation for the alleged IDEA violations is now ripe for judicial resolution.
 
 
 62
 In sum, we conclude that plaintiffs have a right of action pursuant to 42 U.S.C. Sec. 1983, damages are available as a remedy, further recourse to administrative proceedings would be futile, and any exhaustion requirement is excused. Summary judgment on the basis of a failure to exhaust would be inappropriate.
 
 IV.
 
 63
 Defendants next argue that the April 1993 settlement agreement in E.J. I prohibits plaintiffs from bringing this action. In E.J. I, W.B. had sought an independent evaluation of E.J., his classification as neurologically impaired, development of an IEP, and attorney's fees, and Mansfield had cross-petitioned to classify him as perceptually impaired. The stipulation of settlement begins:
 
 
 64
 The parties to these consolidated proceedings have voluntarily resolved all disputed matters and enter into this Stipulation of Settlement which fully disposes of all issues in controversy between the parties.
 
 App. at 250. It goes on to state
 
 65
 4. Both parties are represented by counsel, have reviewed this Stipulation of Settlement[,] ... have conferred extensively with their respective counsels[,] ... and represent that they fully understood the meaning of said documents ... and enter into this settlement agreement knowingly and voluntarily. Both parties expressly represent that they enter into this agreement freely and without fraud, undue influence, or duress ... and that prior to entering into this agreement they fully discussed with their counsels the remedies available to the parties.
 
 
 66
 App. at 251. E.J.'s IEP, which was incorporated by reference in the settlement, provided that "neither party waives its legal and factual contentions ... regarding classification." App. at 190, 225. In approving the agreement, ALJ McGill made a finding that "[t]he settlement fully disposes of all issues in controversy and is consistent with the law." App. at 249.
 
 
 67
 In its July 1994 decision, the district court applied principles of contract construction and concluded that this settlement agreement did not bar W.B.'s civil damages, because the agreement does not mention damages, and ALJ McGill could not have awarded them. W.B. I, slip op. at 5-6. In its second decision, the district court suggested that damages may not be available in a Sec. 1983 IDEA action but concluded that, in any event, the "additional remedies which plaintiffs seek were contemplated by the settlement agreement." W.B. II, slip op. at 3-4 & n. 1. Accordingly, the court vacated its previous order and dismissed the action as barred by the agreement.
 
 
 68
 We must first determine which principles to employ in considering the settlement agreement. Defendants urge us to apply contract rules, and indeed we have held that "contract principles are generally applicable to the construction of settlement agreements." New York State Electric & Gas Corp. v. FERC, 875 F.2d 43, 45 (3d Cir.1989). Were we to do so, our task would be to determine the intent of the parties as manifested in the language of the agreement. Interpretation of an ambiguous contract presents questions of fact, In re Barclay Industries, Inc., 736 F.2d 75, 78 (3d Cir.1984); where the terms of a contract are unambiguous, however, their construction is a question of law appropriate for summary judgment. Kaufman v. Provident Life and Cas. Ins. Co., 828 F.Supp. 275, 282 (D.N.J.1992), aff'd, 993 F.2d 877 (3d Cir.1993). The initial determination of whether terms are ambiguous is itself a question of law. St. Paul Fire and Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 (3d Cir.1991).
 
 
 69
 On the other hand, as plaintiff points out, different rules govern our review of cases in which a person allegedly waives civil rights claims. See Cirillo v. Arco Chemical Co., Div. of Atlantic Richfield Co., 862 F.2d 448, 451 (3d Cir.1988) (release and covenant not to sue in exchange for retirement benefits); Coventry v. United States Steel Corp., 856 F.2d 514, 523-24 (3d Cir.1988) (same). In such cases, we will inquire into the totality of the circumstances surrounding execution of the agreement, and we will decline to enforce the agreement unless its execution was knowing and voluntary. Coventry, 856 F.2d at 524. See also Salmeron v. United States, 724 F.2d 1357, 1361 (9th Cir.1983) ("[a] release of claims for violations of civil and constitutional rights must be voluntary, deliberate, and informed") (citation omitted). We consider such factors as whether (1) the language of the agreement was clear and specific; (2) the consideration given in exchange for the waiver exceeded the relief to which the signer was already entitled by law; (3) the signer was represented by counsel; (4) the signer received an adequate explanation of the document; (5) the signer had time to reflect upon it; and (6) the signer understood its nature and scope. Cirillo, 862 F.2d at 451; Coventry, 856 F.2d at 523. We may also look to whether there is evidence of fraud or undue influence, or whether enforcement of the agreement would be against the public interest. Coventry, 856 F.2d at 522-23. Given the fact-bound nature of these questions, many of which go to a person's state of mind, summary judgment holding that execution of a release was voluntary and knowing may be inappropriate.
 
 
 70
 We are aware of only a few reported decisions concerning Sec. 1983 actions premised on IDEA violations and none discussing whether contract principles or a heightened standard based on the totality of the circumstances should govern review of settlement agreements. Upon examination of the dynamics of an IDEA settlement, however, we find reason to consider employing a more heightened standard. Where a school is resistant, parents seeking special services for their disabled children may be disinclined to delay the start of those services during years of administrative and judicial proceedings. Indeed, a waiver of fees or possible civil rights claims may seem a small price for the immediate commencement of services for a young child just beginning school. Accordingly, while we do not hold that settlement agreements which include a waiver of related claims in the IDEA context are per se invalid, we will apply the more searching standards reserved for waivers of civil rights claims, rather than general contract principles.
 
 
 71
 Review of the relevant factors here leads us to conclude that summary judgment in favor of defendants on the basis of the April 1993 settlement in E.J. I was inappropriate. First, there is at least a dispute of fact whether the agreement is clear and specific as to a waiver of any damage claims. There is no specific mention of damages, and the language indicates that the agreement merely resolved all issues raised in the due process petitions in E.J. I, namely evaluation and classification of E.J. Reference to W.B.'s testimony at the April 1993 settlement hearing does not aid defendants, as the lengthy questioning elicited no statement that the agreement affected any potential civil rights claims W.B. or E.J. might have had. At best, then, we conclude that the language is ambiguous as to damages, and we will leave its interpretation to a factfinder.
 
 
 72
 Second, there is a dispute of fact as to whether the Board gave any consideration for the alleged waiver; the school appears simply to have consented, at long last, to the evaluation and classification to which E.J. was statutorily entitled. See E.J. IV at 54.
 
 
 73
 Third, there is certainly a factual dispute as to whether W.B. understood that the settlement agreement was of the nature and scope that defendants now contend. In opposition to defendants' first motion to dismiss, W.B. submitted a certification to the district court in which she stated: "When I entered into the April 1993 settlement agreement ... I never intended nor did any one advise me that I would be giving up my right to file this civil rights action." App. at 277. If found to be credible, a reasonable juror could conclude based on this statement alone that execution of the settlement agreement was not voluntary and knowing.
 
 
 74
 Fourth, as mentioned above, the Board attorney who questioned W.B. at the April 1993 settlement hearing never raised the topic of damages or a potential civil action. In fact, the questions of the Board attorney--who also represents defendants herein--suggest that W.B. and the Board both understood paragraph 4 of the agreement to limit any other remedies W.B. might have in an administrative proceeding only:
 
 
 75
 Q. And you discussed with your attorney prior to entering into this agreement the remedies that are available to you in legal proceedings of this nature?
 
 
 76
 A. Yes, sir.
 
 
 77
 Q. And you have knowledge of those remedies, and you still want to go through with this settlement?
 
 
 78
 A. Yes sir.
 
 
 79
 App. at 242-43. Such relief does not include damages, so the April 1993 agreement could not have barred this action.
 
 
 80
 Finally, we note that an argument similar to the one raised here, although couched as one of estoppel, was rejected by a New Jersey district court. See E.P. v. Union County Regional High School Dist. No. 1, 741 F.Supp. 1144, 1149-50 (D.N.J.1989) (parent not collaterally estopped in IDEA attorney's fees action by previous settlement of petition, where agreement silent as to fees).
 
 
 81
 Thus, although W.B. was represented by counsel in E.J. I and appears to have had time to reflect upon the settlement agreement, taking all facts in the light most favorable to W.B., the nonmovant, we conclude that material issues of fact remain in dispute regarding whether the alleged agreement by W.B. not to file civil actions against those persons who denied services to her child was voluntary and knowing. Summary judgment would therefore be inappropriate on the basis of the April 1993 agreement.[7]
 
 V.
 
 82
 Defendants also maintained in the district court that they were entitled to qualified immunity. This defense may be raised by school officials alleged to have violated IDEA. See, e.g., Christopher P. v. Marcus, 915 F.2d 794, 798 (2d Cir.1990), cert. denied, 498 U.S. 1123, 111 S.Ct. 1081, 112 L.Ed.2d 1186 (1991).
 
 
 83
 Preliminarily, we note that the doctrine of qualified immunity shields officials acting only in their individual capacities. Brandon v. Holt, 469 U.S. 464, 472-73, 105 S.Ct. 873, 878-79, 83 L.Ed.2d 878 (1985). The claims against defendants in their official capacities are equivalent to claims against the government entity itself, the Mansfield Board of Education, and may not be defended on the basis of qualified immunity.[8] Id.
 
 
 84
 Before determining whether defendants enjoy qualified immunity in their individual capacities, we must determine whether plaintiffs have alleged a constitutional or statutory violation. In re City of Philadelphia, 49 F.3d 945, 961 (3d Cir.1995); Siegert v. Gilley, 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). If so, defendants will nevertheless not be liable if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).
 
 
 85
 For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). In contrast, if "the law is not established clearly when an official acts, he is entitled to qualified immunity because he 'could not reasonably be expected to anticipate subsequent legal developments.' " In re City of Philadelphia, 49 F.3d at 961 (quoting Harlow, 457 U.S. at 817-19, 102 S.Ct. at 2738-39). On the other hand, the "clearly established" standard does not require " 'precise factual correspondence between relevant precedents and the conduct at issue.' " In re City of Philadelphia, 49 F.3d at 970 (citation omitted).
 
 
 86
 In essence, plaintiffs allege that from September 1991, when E.J. entered the first grade, until April 1993, when defendants agreed to implement the IEP, defendants deprived E.J. of the right to a free, appropriate public education, a right secured by IDEA, Sec. 504, and New Jersey's statute and regulations implementing the federal laws. The deprivation of this right is alleged to have violated IDEA (Counts 4, 5, 7); Sec. 504 (Counts 1, 5, 7); procedural due process (Count 2); and the Equal Protection Clause (Count 3).
 
 A. IDEA and Sec. 504 claims
 
 87
 We begin by observing that though phrased as merely establishing conditions on the receipt of federal aid, IDEA in fact "confers upon disabled students an enforceable substantive right to public education in participating States...." Honig v. Doe, 484 U.S. at 310, 108 S.Ct. at 597. See also Mrs. W., 832 F.2d at 750-52 (IDEA creates substantive rights); N.J.A.C. 6:28-1.1(d) ("Each district board of education is responsible for providing a system of free, appropriate special education and/or related services.").
 
 
 88
 The Second Circuit has determined, however, that to defeat a qualified immunity defense in an IDEA action, a plaintiff must show more than that he or she was denied a free, appropriate public education in a general sense; rather, a plaintiff must demonstrate "that the particular actions taken by defendants were impermissible under law established at that time." P.C. v. McLaughlin, 913 F.2d 1033, 1040 (2d Cir.1990). We agree.
 
 
 89
 Specifically, plaintiffs allege that defendants violated IDEA by (1) failing to inform them of their statutory rights; (2) failing to refer E.J. for evaluation from September 1991 until February 1992; (3) failing to advise W.B. in writing of its refusal to evaluate E.J. prior to February 1992; (4) conducting only a limited evaluation of E.J. in April 1992; (5) refusing to develop an IEP until April 1993, in the wrongful belief that E.J.'s academic performance disqualified him for IDEA services; (6) withholding from W.B. evaluation results indicating E.J. may be neurologically impaired; and (7) conditioning the commencement of occupational therapy for E.J. on settlement of W.B.'s due process petitions and refusing to provide those services until January 1993.[9] In addition, plaintiffs allege that defendants violated Sec. 504 by (8) limiting the provision of Sec. 504 services to children also eligible for IDEA services; and (9) refusing to make reasonable accommodations for E.J. from April 1992, when the CST determined he was eligible for Sec. 504 services, until January 1993 when some Sec. 504 services began, and April 1993, when his IEP was implemented.
 
 
 90
 Defendants do not dispute that these specific events occurred. Rather, reasoning backwards in time, they contend that they are not liable for any harm in the period from June 1992 through April 1993, because IDEA's "stay put" provision prevented them from taking any action regarding E.J. once W.B. had filed the petition in E.J. I. They also contend that because a diagnosis of ADHD requires six months of observation, no clearly established law was violated by their failure to refer E.J. for evaluation in his first six months of school, from September 1991 until February 1992. Defendants ignore the four months from February to June 1992, though events in this period are the basis for a distinct cause of action, Count 5.[10]
 
 1. June 1992--April 1993
 
 91
 IDEA does mandate that during the pendency of administrative proceedings a "child shall remain in the then current educational placement." 20 U.S.C. Sec. 1415(e)(3)(A). See also 34 C.F.R. Sec. 300.513(a). This is known as the "stay put" rule. Defendants ignore, however, a relevant exception to this provision: "unless the State or local educational agency and the parents or guardian otherwise agree." 20 U.S.C. Sec. 1415(e)(3)(A). See also 34 C.F.R. Sec. 300.513(a).
 
 
 92
 Defendants' failure to develop an IEP in the June 1992--April 1993 period cannot be excused by reference to the "stay put" rule, since in her June 1992 petition W.B. not only consented to but affirmatively requested development of an IEP. By April 1992 even the CST believed E.J. was eligible for Sec. 504 services, but these were not provided until January 1993. In addition, the independent evaluation conducted in July 1992 revealed that E.J. suffered from not only ADHD but Tourette's Syndrome as well. Yet no IEP was provided until April 1993. Thus, plaintiffs have sufficiently alleged IDEA violations in this period and defendants are not entitled to qualified immunity on the basis of the "stay put" rule.
 
 2. September 1991--February 1992
 
 93
 The IDEA regulations require that New Jersey and the Mansfield Board of Education ensure that "[a]ll children with disabilities, regardless of the severity of their disabilities, and who are in need of special education and related services are identified, located, and evaluated." 34 C.F.R. Sec. 300.128(a)(1) and note 1. See 20 U.S.C. Secs. 1412(2)(C), 1414(a)(1)(A); 34 C.F.R. Secs. 300.220 and note 1, 300.300 note 3; N.J.A.C. 6:28-3.2. Section 504 has a similar requirement. See 34 C.F.R. Sec. 104.32(a).
 
 
 94
 Neither the statutes nor regulations establish a deadline by which time children who are suspected of having a qualifying disability must be identified and evaluated, but we infer a requirement that this be done within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability.[11]
 
 
 95
 Although we specifically announce the "reasonable time" requirement only today, we think the requirement is implicit in the "child find" duty and as such was clearly established in September 1991. First, the statutes and regulations enacting the "child find" duty clearly establish the obligation to identify and evaluate disabled children. Second, to hold otherwise--to hold that the duty need not be discharged within a reasonable time--would eviscerate that duty and thwart the undisputed legislative intent that disabled children be identified, evaluated, and offered appropriate services. It can come as no surprise to a reasonable school official that children must be located and evaluated within a reasonable time, and thus we conclude that a school official who failed to carry out his or her "child find" duty within a reasonable time "would understand that what he is doing violates that [duty]." Anderson, 483 U.S. at 640, 107 S.Ct. at 3039.
 
 
 96
 Here, the record indicates that by October 1991, W.B. had held numerous conversations with defendants Engelhardt, Matula, Noctor, and Burns regarding E.J.'s behavioral problems, and at least Engelhardt and Noctor had significant first-hand knowledge of E.J.'s bathrooming difficulties. In December, W.B. sent Matula information regarding ADHD. In addition, as the director of the CST and the person responsible for implementing IDEA and Sec. 504, Brennan had an ongoing obligation to discharge the "child find" duty.
 
 
 97
 We are not unmindful of the budgetary and staffing pressures facing school officials, and we fix no bright-line rule as to what constitutes a reasonable time in light of the information and resources possessed by a given official at a given point in time. In this case, however, in order to grant summary judgment in favor of the defendant, we would have to conclude as a matter of law that a reasonable official could believe that a delay of six months, from notice and personal observation of behavior indicating a qualifying disability until referral for evaluation, did not violate the "child find" duty.[12] Certainly a reasonable juror could conclude otherwise--i.e. that a reasonable official would believe the duty had been violated by such a delay. Hence summary judgment in favor of defendants would be inappropriate on this basis.[13]
 
 
 98
 Defendants also maintain that they are entitled to qualified immunity for their conduct from September 1991 until February 1992 because a referral for evaluation for ADHD is not indicated unless symptoms are observed for six months. In support of this proposition they cite a legal textbook but no medical authorities. Defendants concede, however, that on September 16, 1991 the U.S. Department of Education issued a memorandum advising that students with ADHD may be eligible for IDEA and Sec. 504 services. On the basis of the law book citation we cannot agree that defendants have carried their burden of establishing that there is no dispute of fact regarding the necessity of observing a child for six months prior to making a referral for an evaluation as to ADHD, especially where, as here, individual defendants had extensive first-hand knowledge of a child's current behavioral problems and history of speech therapy.
 
 
 99
 Accordingly, we conclude that summary judgment on the IDEA and Sec. 504 violations, on the basis of qualified immunity as argued by defendants, would be inappropriate.
 
 B. Constitutional claims
 1. Due Process
 
 100
 In Count 2 of their complaint, plaintiffs allege that the specific acts and omissions listed supra violate the procedural component of the Due Process Clause. "It is well established that the requirements of procedural due process are triggered only when a protected interest is at stake." Stephany v. Wagner, 835 F.2d 497, 499 (3d Cir.1987), cert. denied, 487 U.S. 1207, 108 S.Ct. 2851, 101 L.Ed.2d 888 (1988). Protected liberty interests may arise from either the Constitution or a state statute or regulation. Sandin v. Conner, --- U.S. ----, ----, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995); Sheehan v. Beyer, 51 F.3d 1170, 1173 (3d Cir.1995).
 
 
 101
 Even where one possesses a protected liberty interest, the government may deprive one of that interest so long as the process afforded satisfies the Due Process Clause. Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Generally, to determine the process due in connection with the deprivation of a protected interest, we weigh the factors enunciated in Mathews: the private and governmental interests at stake and the value of additional or different procedures. Id.
 
 
 102
 There can be no doubt that, as a general matter, plaintiffs have alleged a deprivation of E.J.'s right to a free, appropriate public education, secured by IDEA and Sec. 504 and clearly established in September 1991. See Honig v. Doe, 484 U.S. at 327, 108 S.Ct. at 606; Mrs. W., 832 F.2d at 750-52; P.C. v. McLaughlin, 913 F.2d at 1043-44 (treating allegations of IDEA violations as allegations of procedural due process violation). Moreover, as detailed above, plaintiffs have alleged that defendants' conduct violated the specific rights and duties set forth in the federal and state statutory schemes.
 
 
 103
 As to the process that must attend deprivation of IDEA or Sec. 504 rights, plaintiffs do not challenge the statutory schemes themselves as constitutionally inadequate. Rather, plaintiffs contend that those procedures were not followed, such as when defendants failed to provide written notice before declining to evaluate E.J. in the fall of 1991, or that they were deprived of a right without any process at all, such as when defendants failed to provide Sec. 504 services for eight months after defendants agreed E.J. was eligible for them.
 
 
 104
 The procedural due process claim thus tracks the Sec. 1983 claim for IDEA and Sec. 504 violations. For the reasons set forth in Part V(A), we will reverse the grant of summary judgment as to the procedural due process claim. See Christopher P., 915 F.2d at 801 n. 5 (where EHA and due process claims "allege the very same violations," qualified immunity analysis equally applicable to both claims).
 
 2. Equal protection
 
 105
 In Count 3 of the Complaint, plaintiffs allege that defendants' conduct constituted intentional discrimination and reckless and deliberate indifference to E.J.'s constitutional rights, in violation of the Equal Protection Clause. Defendants do not address this claim on appeal, either on the merits or on the basis of qualified immunity, and the district court did not reach it. Accordingly, we will vacate the dismissal of this cause of action. We express no opinion on the merits of this claim.
 
 VI.
 
 106
 In Counts 6 and 8 of their amended complaint, plaintiffs alleged that they were victims of a conspiracy to deprive them of their civil rights in violation of 42 U.S.C. Sec. 1985(3).[14] The Supreme Court has held that Sec. 1985(3) protects persons only from those conspiracies motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). See also Pratt v. Thornburgh, 807 F.2d 355, 357 (3d Cir.1986), cert. denied, 484 U.S. 839, 108 S.Ct. 125, 98 L.Ed.2d 83 (1987). There is no evidence in the record that defendants' alleged deprivation of E.J.'s IDEA and Sec. 504 rights were based on racial or "otherwise class-based" animus.[15] Accordingly, we will affirm the dismissal of these claims.
 
 
 107
 Finally, having concluded that some of plaintiffs' federal claims survive summary judgment, we will reinstate the pendent state causes of action contained in Counts 9 and 10 of the amended complaint, over which the district court declined to exercise jurisdiction once it had dismissed the federal claims. We express no view on the merits of those claims.
 
 VII.
 
 108
 For the foregoing reasons we will affirm the order of the district court in part, reverse in part, vacate in part, and remand for further proceedings consistent with this opinion.
 
 
 
 [1]
 Among other duties, each CST in New Jersey is charged with the responsibility of identifying and diagnosing children needing special education services, developing public school programs for disabled children, and referring disabled children for residential, medical, or psychological treatment. N.J.S.A. Sec. 18A:46-5
 
 
 [2]
 The duties of a CST supervisor "shall include the coordination of the special education services in the county." N.J.S.A. Sec. 18A:46-3
 
 
 [3]
 W.B. filed three other petitions in January and February 1993, seeking to have Mansfield provide her with (1) a written daily log of E.J.'s behavior problems, (2) independent speech, occupational therapy, and educational evaluations, and (3) mediation to resolve her request that the Board fund E.J.'s private psychotherapy. Eventually W.B. prevailed in these requests too. See discussion of E.J. IV, infra
 
 
 [4]
 Shortly after the E.J. I settlement, W.B. requested a few modifications to the IEP and then that E.J. be placed in a private school because the Board was unable to provide the free appropriate education to which E.J. was entitled. The Board refused, two petitions followed, and they were consolidated before ALJ McGill. At the hearing, W.B. withdrew her request for private placement. The Board asked that the withdrawal be with prejudice or conditions, but ALJ McGill granted it without prejudice. E.J. v. Mansfield Board of Education, OAL Dkt. Nos. EDS 6199-93/6302-93, 1993 WL 557646, August 6, 1993 ("E.J. II ") at 9. In August 1993, the ALJ found further that there had been no change of circumstances since implementation of the IEP and dismissed W.B.'s petition to modify it. Id. at 5, 8
 Before the decision in E.J. II was rendered, W.B. filed another petition alleging changed circumstances that necessitated E.J.'s placement in a private school. This petition was referred to ALJ McGill, and on September 1, 1993 he denied it, reasoning that no changed circumstances warranted amending the IEP. E.J. v. Mansfield Board of Education, OAL Dkt. No. EDS 7538-93 (September 1, 1993) ("E.J. III "). W.B. appealed E.J. III to the district court in an action which was consolidated with the instant damages action. W.B. and the Board eventually entered into a stipulation of dismissal regarding the E.J. III claims. See note 8, infra.
 
 
 [5]
 In this opinion we will use "EHA" and "IDEA" interchangeably
 
 
 [6]
 20 U.S.C. Sec. 1415(f) now provides:
 Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973, or other Federal statutes protecting the rights of children and youth with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.
 
 
 [7]
 Even were we to apply contract principles to the agreement, as the above discussion indicates we would conclude that the settlement language was ambiguous as to damages and deny summary judgment on this basis
 
 
 [8]
 In a separate district court action, plaintiffs had sought judicial review of E.J. III. That action, in which the Board was a defendant, was consolidated with the instant damages action. Plaintiffs then stipulated in April 1994 to the dismissal of the Board as to the E.J. III appeal. See W.B. v. Matula, No. 93-3124, Stipulation of Dismissal, April 5, 1994. The dismissal of the Board as to the E.J. III appeal does not prevent plaintiffs from maintaining the current damage action against the remaining defendants in their official capacities as to the damages claims
 
 
 [9]
 Plaintiffs maintain further that the first, second, and third alleged IDEA violations are also Sec. 504 violations
 
 
 [10]
 In the middle period, the CST evaluated E.J., concluded that he had ADHD, determined that he was eligible for Sec. 504 but not IDEA services, and did not commence Sec. 504 services. Count 5 alleges that members of the CST performed an incomplete evaluation, failed to conduct additional expert evaluations, and failed to consider all the information before them
 
 
 [11]
 N.J.A.C. 6:28-2.1(c) directs that once parental consent for evaluation is obtained, a district board of education shall conduct the evaluation, determine eligibility, and develop an IEP within 90 days. This rule does not reveal how quickly a child should be referred for evaluation
 
 
 [12]
 See Angela L., 918 F.2d at 1194 (where parents repeatedly sought special education services, school repeatedly denied requests, and parents ultimately won those services in settlement of administrative proceeding, payment of attorney's fees was appropriate)
 
 
 [13]
 In addition, though not disputed by defendants, we think several of plaintiffs' other specific allegations state colorable claims of violations of clearly established law. See 34 C.F.R. Sec. 104.32(b) (school must notify disabled children and their parents of school's duty under Sec. 504); 20 U.S.C. Sec. 1415(b)(1)(C), 34 C.F.R. Sec. 300.504(a)(2), and N.J.A.C. 6:28-2.3(c)(1) (written notice to parent required when local educational agency declines to initiate evaluation of child); 20 U.S.C. Sec. 1415(b)(1)(A) and 34 C.F.R. Sec. 300.562 (parents may review all records relevant to evaluation and classification of child); 29 U.S.C. Sec. 794(a), 34 C.F.R. Sec. 104.4(a), (b), 34 C.F.R. Sec. 104.37(a) (school must provide Sec. 504 services to children eligible for them); 34 C.F.R. Sec. 300.532(f) (child to be assessed "in all areas related to the suspected disability")
 
 
 [14]
 42 U.S.C. Sec. 1985(3) prohibits a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws...."
 
 
 [15]
 We are not compelled to rule on whether disabled persons are a protected class under Sec. 1985(3) because we find no evidence in the record that defendants were motivated in their actions by an invidious animus against the disabled. We note, however, that there is a circuit split on this issue. The Eighth and Second Circuits have held that Sec. 1985(3)'s protection extends to disabled persons as a class. Larson by Larson v. Miller, 55 F.3d 1343 (8th Cir.1995); People by Abrams v. 11 Cornwell Co., 695 F.2d 34 (2d Cir.1982). The Seventh and Tenth Circuits have held that it does not. D'Amato v. Wisconsin Gas Co., 760 F.2d 1474 (7th Cir.1985); Wilhelm v. Continental Title Co., 720 F.2d 1173 (10th Cir.1983), cert. denied, 465 U.S. 1103, 104 S.Ct. 1601, 80 L.Ed.2d 131 (1984)