Shayne PADILLA, through her legal guardian and next friends, Mariano PA-DILLA and Michelle Padilla, Plaintiff,

v.

SCHOOL DISTRICT NO. 1 IN THE CITY AND COUNTY OF DENVER, COLORA-DO; Denver School District Board of Education; Patrice Hall, Cynthia Rose, Maria Diaz, Jean Boggs, and Jeannie Hayes, individually and in their official capacities as employees of School District No. 1 in the City and County of Denver, Colorado, Defendants.

No. 98–WY–1262–CB.

United States District Court,
D. Colorado.

Jan. 19, 1999.

Patrick A. Mooney, Denver, CO, for plaintiffs.

Linda M. Davison, Law Office of Kathleen Mullen, P.C., Denver, CO, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS IN PART AND DENYING IT IN PART

BRIMMER, District Judge.

This matter comes before the Court pursuant to Defendants' motion to dismiss Plaintiff's complaint under Rules 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure. The Court, being fully advised of the premises, **FINDS** and **ORDERS**:

### Background

Shayne Padilla was an eleven-year old (at the time of filing this action) girl with medical and developmental disabilities who was enrolled in Denver County and City School District No. 1 ("DPS") between 1992 and 1997. Plaintiff has sued the school district and five individual district employees: Patrice Hall, the school district's Special Education Director; Cynthia Rose, a school district behavior specialist; Maria Diaz, a special education teacher; Jean Boggs, a school nurse; and Jeannie Hayes, a paraprofessional aide.

Shayne began attending DPS in 1992. (Am.Compl.¶ 9.) On October 5, 1992, Shayne was referred to the Alternative Resources Team as a child with disabilities. (Am. Compl.¶ 10.) Shayne was identified as a child that required various special education requirements. (Am.Compl.¶ 10.)

During the 1993–1994 school year, Shayne was permitted by DPS to attend Ellis Elementary School on a one-half day basis. (Am.Compl.¶ 12.) On February 2, 1994, an Administrative Review Team was scheduled to discuss the amount of time Shayne could spend at school each day. (Am.Compl.¶ 12.) However, at the meeting the Team discussed the educational level of service, a change in location of service, and a reevaluation of Shayne's disability. (Am.Compl.¶ 16.) DPS administrators then promised Mrs. Padilla (Shayne's mother) that a plan would be developed to provide behavioral augmentative communication services to Shayne. (Am. Compl.¶ 19.)

On February 8, 1994, ARC of Denver, on behalf of the Padilla family, wrote a letter to Patrice Hall, giving her notice of DPS's failure to provide clear goals and objectives for Shayne's special education program. (Am. Compl.¶ 20.) But DPS failed to take any action based on the letter. (Am.Compo.¶ 21.)

On March 10, 1994, DPS developed an Individual Education Plan ("IEP") for Shayne. (Am.Compl.¶ 24.) The IEP indicated that Shayne needed: (1) the use of augmentative/alternative communications systems and consultations; (2) auditory training and speech training by school staff; (3) a behavior management plan; (4) consultation from a hearing disabilities specialist; and (5) ongoing behavior consultations. (Am. Compl.¶ 24.)

However, DPS failed to carry out Shayne's IEP. (Am. Compl. ¶ 25.) Cynthia Rose observed Shayne in the classroom on March 10, 1994, but no specific behavior management plan was created or implemented. (Am. Compl.¶ 26.) On March 22, 1994, Rosemary Hare, a hearing and speech therapist, evaluated Shayne in her classroom and found it to be large and chaotic and the staff used restraint rather than redirection when moving Shayne from one room to another. (Compl.¶ 22.)

In 1996, DPS rezoned the schools. (Am. Compl.¶ 29.) Shayne was thus transferred to Park Elementary School. (Am.Compl.¶ 30.) Shayne reacted to this change in environment by "acting out" at school. (Am. Compl.32.) But DPS took no steps to identify the reasons for Shayne's actions or to create a behavior modification plan to ad-

dress Shayne's actions. (Am.Compl.¶ 33.) Further, Park Hill staff refused to tube feed Shayne even though it was required according to her 1996 IEP. (Am.Compl.¶ 34.)

In September 1996, Patrice Hall called Mrs. Padilla to tell her that Shayne could no longer attend Park Hill because the staff was not trained to accommodate Shayne's needs. (Am.Compl.¶ 35.) Ms. Hall told Mrs. Padilla that the only option for Shayne was to transfer to her home school, Centennial Elementary. (Am.Compl.¶ 40.) Despite Mrs. Padilla's concerns, Shayne was placed in Centennial Elementary. (Am.Compl.¶ 42.)

On October 1, 1996, Mrs. Padilla and other parents of disabled children met with Denver School Board member Laura Lefkowitz. (Am.Compl.¶ 43.) At the meeting, Mrs. Padilla voiced her concern over the refusal to tube feed Shayne, the failure to implement a behavioral management plan, and the failure to address Shayne's communication needs. (Am.Compl.¶ 44.) Ms. Lefkowitz promised to look into the concerns. (Am.Compl.¶ 47.)

In November 1996, Mrs. Padilla agreed to bring a stroller to school which would be used to move Shayne from the classroom to the resource room. (Am.Compl.¶ 50.) Additionally, several meetings were held to develop behavior modification techniques for Shayne. (Am.Compl.¶ 51.) The behavior modification techniques were documented in Action Plans and included: (1) that DPS staff learn to detect precipitous behaviors leading to Shayne's outbursts; (2) that DPS staff intervene before outbursts occur; (3) that DPS staff use visual cues with verbal information to redirect Shayne; (4) that DPS staff identify three other means of redirection; and (5) if these techniques were not successful, that DPS staff may place Shayne in her stroller and wheel her out of the area until she is calm. (Am.Compl.¶ 52.) Maria Diaz, Jean Boggs, and Cynthia Rose were all instrumental in developing these techniques. (Am.Compl.53.)

DPS failed to provide any further guidance on how to implement these techniques. (Am. Compl.¶ 56.)

Mrs. Padilla never gave permission to use the stroller as a "time out" or a means of physical restraint. (Am.Compl.¶ 56.) The Centennial staff, however, used the stroller as a means of restraint and "time out." (Am. Compl.¶ 57.) Between November 1996 and February 1997, Jeannie Hayes, placed Shayne in the stroller and put her in a closet off the resource room, unobserved and unsupervised, for fifteen to twenty minutes at a time. (Am.Compl.¶ 58.) Nevertheless, on February 4, 1997, Centennial staff assured Mrs. Padilla that the resource room was being used as a quiet setting where Shayne could get one-on-one attention. (Am. Compl.¶ 60.)

A new IEP was also developed for Shayne at this time. (Am.Compl.¶ 61.) This included: (1) the need for consistency, predictability and routines; (2) the need for adequate preparation time for transitions; (3) the need for visual modes and cues for transitioning; (4) the need to have her intent interpreted by the DPS staff; and (5) the need for a behavior management plan, which was in progress. (Am.Compl.¶ 61.)

Restraining Shayne in her stroller and placing her in a closet unobserved was in direct contradiction to her February 4, 1997, IEP and November and December Action Plans. (Am.Compl.62.) Mrs. Padilla advised DPS staff on several occasions that they should not restrain or grab Shayne. (Am. Compl.¶ 65.) Further, DPS staff, including Cynthia Rose, were on notice of Shayne's averseness to restraining because her administrative and educational files contained many notations to that effect. (Am.Compl.¶ 66.) One such document was a letter from Mrs. Padilla specifically stating that DPS staff should not use "time outs" and that Shayne will struggle and resist such attempts out of fear of being hurt. (Am.Compl.¶ 67.)

On February 12, 1997, Ms. Hayes tried to force Shayne to eat, which caused Shayne to become agitated. (Am.Compl.¶ 69.) When Shayne became agitated, the Centennial staff did not follow any of the strategies outlined in the IEP or Actions Plans. (Am. Compl.¶¶ 70–72.) Instead, Ms. Hayes and Ms. Diaz and other DPS personnel placed Shayne in her stroller, restrained her with a seat belt attached to the stroller, and wheeled the stroller into the small storage closet off the resource room. (Am. Compl.¶ 73.) Ms. Hayes backed the stroller

against the far wall in the storage closet and left Shayne unattended. (Am.Compl.¶ 73.) Shayne became more agitated and upset. (Am.Compl.¶ 74.) The stroller toppled backwards, causing Shayne to hit her head on the floor. (Am.Compl.¶ 76.) No one was supervising Shayne at this time. (Am.Compl.¶ 77.) As a result of this fall, Shayne suffered a skull fracture. (Am.Compl.¶ 79.)

Immediately after the fall, Shayne appeared dazed and confused. (Am.Compl.¶ 80.) Despite these signs, after examination by Ms. Boggs, DPS staff attempted to feed Shayne, causing her to vomit food and blood. (Am.Compl.¶ 80.) DPS staff then contacted Mrs. Padilla, but did not seek any immediate medical attention. (Am.Compl.82.)

As a result of this fall, Shayne has suffered pain, bruising, swelling, cranial bleeding, a significant increase in seizure activity, along with other adverse symptoms. (Am.Compl.¶ 86.)

At the end of the 1996–1997 school year, the Padilla family moved to Adams County. (Am.Compl.¶ 95.) Shayne currently receives educational services through Adams County. (Am.Compl.¶ 95.)

Plaintiff brings two claims for relief. First she alleges that her rights were violated under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., because the defendants "excluded Plaintiff from participation in publicly funded general and special educational programs at Denver Public Schools, and denied her the benefits of those programs because of the nature of her disability, in violation of Title II of the ADA." Plaintiff also brings a cause of action under 42 U.S.C. § 1983, alleging that Defendants deprived her of her federal statutory right to a free and appropriate public education as provided for under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.

### Discussion

Dismissal for failure to state a claim upon which relief can be granted is warranted only where a plaintiff can prove no set of facts that would entitle him to relief. *Jojola v. Chavez*, 55 F.3d 488, 490 (10th Cir.1995). The factual allegations are taken as true and all inferences are resolved in the Plaintiff's

favor. *Seamons v. Snow*, 84 F.3d 1226, 1231–32 (10h Cir.1996). However, the plaintiff must allege sufficient facts on which a recognized legal claim may be based. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Further, conclusory allegations with no factual support are insufficient to state a claim upon which relief can be granted. *See id.* Given these standards, the Court turns to Defendants' motion to dismiss.

### A. IDEA History

In 1975, Congress recognized the need for appropriate educational services for disabled children by enacting the Education of the Handicapped Act (the "EHA"). 20 U.S.C. § 1400 et seq. Under the EHA, state and local school districts must assure that:

> to the maximum extent appropriate, handicapped children ... are educated with children who are not handicapped, and that ... removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes, with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5).

In 1984, the Supreme Court held that a disabled child could not bring a § 1983 action to enforce rights under the EHA. *See Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984). Congress responded to the *Smith* decision with this amendment to the EHA:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies under the Constitution, Title V of the Rehabilitation Act of 1973, or other federal statutes protecting the rights of handicapped children and youth, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(f) (Supp.1998). The enactment of this amendment expressly overruled

*Smith. See, e.g., Mrs. W. v. Tirozzi,* 832 F.2d 748, 754 (2d Cir.1987).

In 1990, Congress renamed the EHA as IDEA. IDEA was amended again on June 4, 1998, at which time § 1415(f) became § 1415(*l*). The only change made in § 1415(*l*) was the addition of the phrase "the Americans with Disabilities Act" in recognition that the ADA was another vehicle by which handicapped children could vindicate their rights.

### B. Exhaustion of Plaintiff's Administrative Remedies Would Have Been Futil

■ Defendant first moves to dismiss both of Plaintiff's claims because Plaintiff failed to exhaust her administrative remedies. If a child seeks legal relief that is also available under IDEA, she must exhaust the administrative procedures set out in § 1415(b)(2) and § 1415(c). *See* 20 U.S.C. § 1415(1).

20 U.S.C. § 1415(b)(2) (1994) provides:
Whenever a complaint has been received under paragraph (1) of this subsection, the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the state education agency or by the local educational agency or intermediate educational unit, as determined by state law or by the state educational agency. No hearing conducted pursuant to the requirements of this paragraph shall be conducted by an employee of such agency or unit involved in the education care of the child.

20 U.S.C. § 1415(c) (1994) provides:
If the hearing required in paragraph (2) of subsection (b) of this section is conducted by a local educational agency or an intermediate educational unit, any party aggrieved by the findings and decision rendered in such a hearing may appeal to the state educational agency which shall conduct an impartial review of such hearing. The officer conducting such review shall make an independent decision upon the completion of such review.

In the case at bar, Plaintiff requested a due process hearing from DPS. In her request for hearing, Plaintiff requested "any relief that is available through the DPS administrative process, including money dam-

ages or attorney fees." A hearing was scheduled for April 14, 1998.

However, on April 1, 1998, DPS moved to dismiss Plaintiff's due process hearing on the following grounds: (1) that the hearing officer did not have jurisdiction to hold the due process hearing, (2) that Plaintiff was entitled to a due process hearing only on her current educational placement, and (3) that the request for a due process hearing did not relate to the identification, evaluation, educational placement, or the provision of a free appropriate education.

On April 6, 1998, the hearing officer dismissed Plaintiff's request for a due process hearing because his authority did not allow for money damages, "nor did [he] see any relief a Hearing Officer [could] grant a student presently residing and attending school in another county and in another school district."

The Court finds that exhaustion was not required in this case because further administrative appeal would have been futile. Here Plaintiff was never granted a due process hearing, but instead was denied one on grounds that the hearing officer did not have authority to grant "any relief." Congress specified this same circumstance as one where exhaustion of administrative remedies is not required under IDEA:

(1) it would be futile to use the due process procedures ...; (3) it is improbable that adequate relief can be obtained by pursuing administrative remedies (e.g., the hearing officer lacks the authority to grant the relief sought ...

H.R.Rep. 296, 99th Cong., 1st Sess. 7 (1985). It is simply illogical for DPS to try and argue that Plaintiff must have exhausted her administrative remedies in one breath, when at the same time it has argued that Plaintiff has no right to such a hearing. *See Thompson v. Board of Special Sch. Dist. No. 1,* 936 F.Supp. 644, 648 (D.Minn.1996), *aff'd,* 144 F.3d 574 (8th Cir.1998).

Furthermore, the great weight of authority suggests waiving exhaustion is appropriate in this circumstance. For instance, in *Hayes v. Unified School Dist. No. 377,* the Tenth Circuit stated: "Exhaustion of remedies is not

required if adequate relief is not reasonably available or pursuit of such relief would be futile." 877 F.2d 809, 814 (10th Cir.1989) (citations omitted); *see also, e.g., W.B. v. Matula,* 67 F.3d 484, 496 (3rd Cir.1995) (exhaustion excused where relief sought by Plaintiff was not available in IDEA administrative proceedings); *Kerr Center Parents Ass'n v. Charles,* 897 F.2d 1463, 1470 (9th Cir.1990) (no exhaustion required where administrative agency lack ability to grant relief requested); *Bray by Bray v. Hobart City Sch. Corp.,* 818 F.Supp. 1226, 1233 (N.D.Ind. 1993) (exhaustion of administrative remedies not required where hearing officer lacked authority to grant relief requested).

Because the plaintiff lived outside of the district at the time of the due process hearing, the hearing officer lacked authority to grant relief. DPS recognized as much when it successfully moved to dismiss Plaintiff's request for a due process hearing. DPS may not successfully argue that Plaintiff failed to exhaust her administrative remedies when it had Plaintiff's due process hearing dismissed. Therefore, because the hearing officer's authority went only as far as the school district's boundaries, and could not grant monetary relief in any event, any appeal of Plaintiff's denied request for an administrative hearing would have been futile.

Defendant's motion to dismiss Plaintiff's claims for failure to exhaust her administrative remedies is therefore **DENIED.**

## C. General Damages Are Available In § 1983 Actions Predicated Upon IDEA

■ Whether general damages are available under IDEA is far from settled. Indeed, to the Court's knowledge, this will be the first time a Tenth Circuit court has addressed the issue directly. Under 42 U.S.C. § 1983, a plaintiff may bring a cause of action for violating the constitution or a federal statute. Section 1983 does not expand any rights provided by statute, it merely secures them.

Defendant has moved to dismiss Plaintiff's § 1983 claim because Plaintiff is seeking damages. Defendant contends that damage actions are not available under § 1983 when one is suing for violations of IDEA. In making this argument, Defendant primarily relies on *Crocker v. Tennessee Secondary Sch. Athletic Ass'n,* 980 F.2d 382 (6th Cir.1992), and *Heidemann v. Rother,* 84 F.3d 1021 (8th Cir.1996).

In *Crocker,* the Sixth Circuit found that the claim in that instance should be dismissed because claims for general damages were not allowed under IDEA. *See id.* at 386. The Sixth Circuit recognized that IDEA confers the authority upon courts to "grant such relief as the Court determines appropriate." *Id.* But the court of appeals found that damages for emotional anguish in that case did not constitute appropriate relief. *See id.* The Sixth Circuit based its decision on the fact that *Burlington School Community v. Massachusetts Department of Education* interpreted IDEA to not allow general damages, and that it had decided this issue in an earlier Sixth Circuit case. 471 U.S. 359, 371–71, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

Likewise, the Eighth Circuit also determined that general damages were not available under IDEA. *See* 84 F.3d at 1033. In drawing this conclusion, the Eighth Circuit essentially relied on the reasoning of *Crocker.*

Although not cited by either party, the Fourth Circuit also found that general damages were not available under IDEA. *See Sellers v. School Bd. of City of Manassas, Virg.,* 141 F.3d 524 (4th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 168, 142 L.Ed.2d 137 (1998). The Fourth Circuit conducted a thorough analysis of the legislative scheme behind IDEA. However, the Fourth Circuit also relied heavily on its prior holding in *Hall by Hall v. Vance County Board of Education,* 774 F.2d 629 (4th Cir.1985), which declared that compensatory damages were not available. The Fourth Circuit concluded by finding that compensatory damages were simply inconsistent with IDEA's equitable scheme.[1] *See Sellers,* 141 F.3d at 527.

---

1. However, as the Court will explain, like the Sixth and Eighth Circuits, the Fourth Circuit wholly ignored the proper analytical starting point for deciding this issue as set forth in *Franklin v. Gwinnett County,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).

Contrary to these three circuits, the majority of federal courts confronting this question have concluded that IDEA allows a cause of action for general damages. *See, e.g., W.B.,* 67 F.3d at 494; *Quackenbush v. Johnson City Sch. Dist.,* 716 F.2d 141, 148 (2d Cir.1983); *Emma C. v. Eastin,* 985 F.Supp. 940, 943 (N.D.Cal.1997); *Walker v. District of Columbia,* 969 F.Supp. 794, 795 (D.D.C.1997). Indeed, when one starts with the proper analytical framework, the plain language and legislative history of IDEA leave no doubt that compensatory damages are available.

In *Franklin,* the Supreme Court confronted the question whether there was an implied right of action under Title IX of the Education Amendments of 1972. *See id.* at 62, 112 S.Ct. 1028. The district court had dismissed the action initially, finding that Title IX did not authorize the award of damages. *See id.* at 64, 112 S.Ct. 1028. The Supreme Court held that compensatory damages were available. *See id.* at 71, 112 S.Ct. 1028. In making this decision, the Court started from the maxim that " '[w]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to made good the wrong done.' " *Id.* at 66, 112 S.Ct. 1028 (quoting *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). In *Franklin,* the Court reaffirmed this principle by holding "[t]he general rule ... is that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Id.* at 70, 112 S.Ct. 1028. The question this Court confronts today is analogous: whether compensatory damages are available under IDEA—a statute that has a provision providing for a general right to any appropriate relief, just as in *Franklin.* Consequently, the *Franklin* "presumption" should not be ignored as it was by the Sixth, Eighth, and Fourth Circuits. Those circuit courts did not even mention *Franklin* in their analyses.

The plain language of IDEA supports awarding compensatory damages. For instance, Section § 1415(1) states that "[n]othing in this chapter shall be construed to limit the rights, procedures, and remedies available under the Constitution, Title V of the Rehabilitation Act of 1973, or other Federal Statutes...." Moreover, the plain language of the remedy provision in IDEA commands that a court may "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2) (1994). There is no restriction for money damages. Thus, plain language of IDEA statute specifically leaves the remedies available under IDEA to the courts' discretion. Absent any Congressional intent to the contrary, a court may order any appropriate relief, including money damages. *See Franklin,* 503 U.S. at 69, 112 S.Ct. 1028.

When one looks to the legislative history of IDEA, there is no "clear indication" by Congress that it intended to foreclose compensatory damages. IDEA was adopted in 1975, only a few years after Title IX. *See Emma C.,* 985 F.Supp. at 944. When considering the legal context of that period, the Court in *Franklin* found that "[i]n the years before and after Congress enacted [Title IX], the Court followed a common-law tradition and regarded the denial of a remedy as the exception rather than the rule." 503 U.S. at 71, 112 S.Ct. 1028. Presumably Congress knew that a clear statutory expression against awarding monetary damages would be required to foreclose that remedy when legislating during that time period.[2] *See id.* at 72, 112 S.Ct. 1028. Further, there is no clear expression of an intent to preclude a monetary remedy in the legislative history of IDEA amendments. *See Individuals with Disabilities Education Act Amendments of 1997,* Pub.L. No. 105–17, 1997 U.S.C.A.A.N. (111 Stat. 37) 78; *Education of the Handicapped Act Amendments of 1990,* Pub.L. No. 101–476, 1990 U.S.C.A.A.N. (104 Stat. 1103) 1723; *The Handicapped Children's Protection Act of 1986,* Pub.L. No. 99–372, 1986 U.S.C.A.A.N. (100 Stat. 796) 1798; *see also, e.g., Emma C.,* 985 F.Supp. at 945 (concur-

---

**2.** The Seventh Circuit also discovered this statutory silence in *Anderson v. Thompson* when it found that IDEA did not allow for money damages. *658 F.2d 1205,* (7th Cir.1981). But this interpretation came before the *Franklin* decision. Consequently, the same statutory silence the Seventh Circuit found compelled finding no monetary relief now compels the opposite result.

ring with this proposition). Consequently, as *Franklin* observed, "[i]f a right of action exists to enforce a federal right and Congress is silent on the question of remedies, a federal court may order any appropriate relief." *Id.* at 69, 112 S.Ct. 1028. IDEA's congressional silence should end the inquiry. But even if it did not, the Court has further support for its conclusion.

The Supreme Court's *Burlington* decision did not preclude awarding compensatory damages under *IDEA* as the Sixth and Eighth Circuits concluded. *See* 471 U.S. at 371, 105 S.Ct. 1996. In that case, the Supreme Court was determining whether reimbursing a parent for the costs of private education should be characterized as damages. *See id.* at 370–71, 105 S.Ct. 1996. The Supreme Court merely found that the question of *reimbursement* was properly left to the due process procedures. *See id.* at 371, 105 S.Ct. 1996. The Court in no way decided the question of whether general damages were ever available. *See id.* To characterize that discussion as such truly stretches the judicial imagination. Again, the Supreme Court merely interpreted the question of reimbursement for costs of private education that the parent plaintiff had to pay, and never discussed the availability of general damages. Instead, the Court discussed the characterization of the remedy pursued in that specific case. *See id.*

The Court further notes that Tenth Circuit courts do disregard the *Franklin* presumption when deciding the compensatory damage question. Judge Babcock's decision in *Tanberg v. Weld County Sheriff* is instructive. 787 F.Supp. 970 (D.Colo.1992). There, Judge Babcock determined that compensatory damages were available under the Rehabilitation Act. *See id.* at 973. Judge Babcock, like this Court, started with the *Franklin* presumption. *See id.* at 972. Judge Babcock found that there was no clear expression by Congress to preclude monetary remedies. *See id.* at 973. Further, like here, he found that monetary remedies would compensate the plaintiff better in that case and *Franklin* commands that the adequacy of

monetary damages should be analyzed before equitable remedies are considered.[3] *See id.* at 972.

This Court simply cannot ignore the fundamental mis-starting point of the Sixth, Eighth, and Fourth Circuits. One must start with the presumption that any and all relief is available under a federal statute. Curiously, not only did those courts of appeal ignore the *Franklin* presumption, but they ignored *Franklin* in its totality. *Franklin* was not even mentioned in any of those opinions. As previously discussed, when one starts with the *Franklin* presumption, the outcome is clear.

In this case, when heeding the express statutory command of "appropriate relief," compensatory damages are especially suitable. Here the plaintiff's family had planned on moving to another school district before the incident in question occurred. After the incident occurred, the plaintiff's family was most likely even more resolved to move out of the school district. In April of that same year the plaintiff's family signed a contract to move to another school district. In August of that year, the plaintiff's family moved. Consequently, equitable relief is not appropriate in this case because the plaintiff's family has moved outside of the school district. As *Franklin* noted, compensatory damages should first be assessed before equitable remedies in any event. Here, there would be no "appropriate remedy" without compensatory damages.

Finally, the Court must note that it is aware of the practical implications of allowing damages in IDEA cases. For instance, compensatory damages could discourage educators from implementing innovative programs and may expose school districts to liabilities. *See Emma C.,* 985 F.Supp. at 945. As a result, the Court heeds the Third Circuit's admonition:

> We caution that in fashioning a remedy for an IDEA violation, a district court may wish to order educational services, such as compensatory education beyond a child's

---

**3.** Finally, in *Tyler v. City of Manhattan,* while the majority dismissed an ADA claim for failure to allege intentional discrimination, a powerful dissent recognized the *Franklin* rationale in arguing that compensatory damages are available under Title II of the ADA. *See* 118 F.3d 1400, 1407–15 (10th Cir.1997) (Jenkins, J. dissenting).

age of eligibility, or reimbursement for providing at private expense what should have been offered by the school, rather than compensatory damages for generalized pain and suffering.

*W.B.*, 67 F.3d at 495. In the instant case, however, equitable remedies are impossible. Without compensatory damages, Plaintiff would have no remedy under IDEA.

Therefore, Defendants' motion to dismiss Plaintiff's § 1983 claim on the ground that no compensatory damages are available is **DENIED**.

### D. IDEA Allows Individual Liability Lawsuits

 Defendants next argue that the plaintiff may not pursue a § 1983 claim against individual defendants because IDEA does not allow individual liability suits as a general rule. It is well established that § 1983 allows individual liability suits. *See McClelland v. Facteau*, 610 F.2d 693, 697 (10th Cir.1979). But § 1983 does not expand substantive rights. Instead, it provides a vehicle through which federal statutory and constitutional violations can be redressed. Thus, if IDEA does not provide for individual liability, none is available under § 1983.

The Court finds that Defendant's argument is without merit. Defendant relies on two second circuit decisions, *Gerasimou v. Ambach*, 636 F.Supp. 1504, 1509 (E.D.N.Y. 1986), and *Quackenbush*, 716 F.2d at 148. *Gerasimou* recognized that *Quackenbush* held as a general matter § 1983 actions are not available for violating IDEA when the administrative proceedings when run their course. *See Gerasimou*, 636 F.Supp. at 1509. But neither one of these courts addressed the issue whether IDEA allows individual liability. Defendants merely assumed that because § 1983 suits were not available, no individual liability exists.

---

4. When one looks to the plain language of 20 U.S.C. § 1415(1), one can recognize that individual liability suits are available. This subsection effectively granted an individual cause of action. In doing this, § 1415 specifically references other federal statutes in which suits against individuals are allowed. Congress made no attempt to distinguish an IDEA action from those other federal statutes in which relief is permitted and the Court has no reason (and Defendants have supplied none) to conclude otherwise.

---

What Defendants fail to realize is that *Quackenbush's* conclusion (that § 1983 actions are not generally available) was drawn in similar terms to the Supreme Court's decision in *Smith*, which held that individual actions for violations of IDEA were not available. But as previously discussed, Congress passed legislation that expressly allowed for individual causes of action. *See* 20 U.S.C. § 1415(1). Thus, *Quackenbush's* conclusion that § 1983 actions are not available under IDEA is no longer true. Necessarily, Defendants logical extension of that conclusion—that IDEA does not allow for individual liability—is also no longer the law of the land.

No courts have addressed the issue of whether § 1983 allows individual liability for violations of IDEA. Instead, courts have assumed that a cause of action exists against individuals for substantive violations of IDEA in light of Congress's amendments to IDEA.[4] *See, e.g., Hayes*, 877 F.2d at 811; *W.B.*, 67 F.3d at 493; *Walker*, 969 F.Supp. at 796.

Thus, Defendants' motion to dismiss Plaintiff's § 1983 claim because IDEA does not allow individual liability suits is **DENIED**.

### E. Qualified Immunity

 As a prefatory matter, the Court notes that the doctrine of qualified immunity only shields officials acting in their individual capacity. *See Brandon v. Holt*, 469 U.S. 464, 472–73, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). The claims against Defendants in their official capacities are tantamount to claims against the government entity itself and may not be defended on a qualified immunity basis.[5] *See id.*

 When a defendant asserts the qualified immunity defense, the Court must first determine whether a plaintiff has sufficiently

---

5. Likewise, it appears from Plaintiff's amended complaint that she is suing the school board as an entity, and not the individual members in their individual capacities. Therefore, this analysis will not address the School District or School Board's qualified immunity; qualified immunity is not available to entities, only individuals. *See Brandon*, 469 U.S. at 473, 105 S.Ct. 873.

alleged a violation of a constitutional or statutory right. *See Tonkovich v. Kansas Bd. of Regents,* 159 F.3d 504, 516 (10th Cir.1998). If the Court answers this question in the affirmative, the Court determines whether the right was clearly established such that a reasonable person in a defendant's position would have known that his or her conduct violated that right. *See id.* (citation omitted).

For a right to be clearly established, ordinarily "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir.1992). Nevertheless, the precise action or omission in question need not previously have been held unlawful. *See Yvonne L. v. New Mexico Dept. of Human Servs.,* 959 F.2d 883, 891 (10th Cir.1992).

But the plaintiff must do more than identify an abstract right; the plaintiff must articulate the clearly established right and the conduct that violated it with specificity. *See Tonkovich,* 159 F.3d at 517 (citations omitted). Thus, the "clearly established" inquiry is two-fold. And "if [this Court] denies [a] defendant qualified immunity, the court [will] identify on the record the defendant's conduct that violated clearly established law." *Mick v. Brewer,* 76 F.3d 1127, 1134 (10th Cir.1996) (citation omitted).

The Court's review of whether Plaintiff is entitled to qualified immunity is limited to the pleadings. *See Dill v. City of Edmond,* 155 F.3d 1193, 1203 (10th Cir.1998). Where the qualified immunity defense is asserted at the motion to dismiss stage, the complaint must "contain 'specific, non-conclusory allegations of fact sufficient to allow the ... court to determine that those facts, if proved, demonstrate that the actions taken were not objectively reasonable in light of the clearly established law.'" *Id.* (citation omitted).

Plaintiff contends that the clearly established right in this instance is IDEA. IDEA "confers upon disabled students an enforceable substantive right to public education in participating States...." *Honig v. Doe,* 484 U.S. 305, 310, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). But "a plaintiff must show more than that he or she was denied a free, appropriate, public education in a general sense; rather, a plaintiff must demonstrate 'that the particular actions taken by defendants were impermissible under law established at that time.'" *W.B.,* 67 F.3d at 499–500 (quoting *P.C. v. McLaughlin,* 913 F.2d 1033, 1040 (2d Cir.1990).

### A. Violation of Shayne's IEP

Plaintiff asserts that Defendants violated her right to a free and appropriate public education, in part, by not following her Individual Education Plan ("IEP"). IDEA defines free and appropriate public education as "special education and related services that meet the standards of the state educational agency and are in conformity with the IEP for each student." 20 U.S.C. § 1401(18) (1994). This provision has been in effect since 1975. Given this statute and the Tenth Circuit's acknowledgment of public education's obligation to provide IEPs under IDEA, the Court finds that adhering to a student's IEP is a clearly established right such that if a reasonable person does not follow a student's IEP, one would understand that she is violating that right. *See O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233,* 144 F.3d 692, 698 (10th Cir.1998) (listing requirements for developing a child's IEP and explaining that an IEP is the basic mechanism for implementing IDEA); *Murray v. Montrose County Sch. Dist. RE-1J,* 51 F.3d 921, 927–28 (10th Cir.1995) (listing IDEA's comprehensive requirements).[6]

However, Plaintiff must still carry her burden of alleging specific facts which show that Defendants violated Shayne's IEP in such a way that a reasonable person would recognize that their action or inaction was a violation of Shayne's statutory rights. The Court will address Plaintiff's allegations regarding each defendant in turn.

---

**6.** Indeed, Defendants admitted that violating one's IEP is a clearly established right when they argued "Plaintiff has not alleged a violation of the IEP," and thus Plaintiff has not alleged a violation of a clearly established right. (Defs.' Mot.Dis. at 12.)

### 1. Behavioral Specialist Cynthia Rose

██ It is alleged that although Cynthia Rose observed Plaintiff in the classroom on March 10, 1994, she did not create or implement a specific behavior management plan at that time. (Am.Compl.¶ 26.) In fact, no behavior modification techniques were implemented until November 1996. (Am. Compl.¶¶ 50–51.) This behavior management plan was required according to Shayne's 1994 IEP. More than a two-year delay in implementing some type of behavior modification plan is a delay such that a reasonable person in Ms. Rose's position would recognize that she violated Shayne's IEP. Given these allegations, the Court finds that Plaintiff has carried her burden of alleging specific facts which show that, if proven, a reasonable person would realize that she is violating Shayne's rights under IDEA.[7] Accordingly, Ms. Rose is not entitled to qualified immunity at this stage in the proceedings.

### 2. Director of Special Education Patrice Hall

██ Plaintiff alleges that Patrice Hall violated her rights because Ms. Hall was on specific notice that DPS staff were not adhering to Shayne's IEP in many ways. (Am.Compl.¶¶ 20, 46, 66–67, 108–110.) If Ms. Hall was in fact aware of the tactics alleged by Plaintiff in her complaint, as the Special Education Director she acquiesced in not taking steps to prevent staff from violating Shayne's rights. Ms. Hall was the final decision maker responsible for providing and/or ensuring Shayne's appropriate care. (Am.Compl.¶¶ 117–18.) There can be no doubt that Plaintiff has carried her burden of alleging specific facts that show a dereliction of duties to follow Shayne's IEP on Ms. Hall's behalf. Accordingly, Ms. Hall is not entitled to qualified immunity at this stage in the proceedings.

### 3. Special Education Teacher Maria Diaz and Paraprofessional Aide Jeannie Hayes

██ Plaintiff alleges that between November 1996 and February 1997, Ms. Hayes placed Shayne in a stroller and put her in a closet unobserved and unsupervised as a means of restraint and for a "time out" when Shayne would become unruly. (Am.Compl.¶ 58.) This was done without Mrs. Padilla's knowledge or consent. (Am.Compl.¶ 56.) On February 12, 1997, Ms. Diaz and Ms. Hayes placed Plaintiff in the stroller, and then placed the stroller in the storage closet unsupervised. (Am.Compl.¶ 73.) The stroller toppled backwards, causing Shayne to hit her head. (Am.Compl.74.) Shayne sustained a skull fracture as a result of this fall. (Am.Compl.¶ 79.) Ms. Diaz and Ms. Hayes did not follow any of Shayne's IEP guidelines during this episode. (Am.Compl.¶¶ 70–72.)

These facts, if proven, are in direct contradiction with Shayne's IEP behavior plan and rights under IDEA. *See Hayes,* 877 F.2d at 813 (holding that discipline falls within the scope of IDEA in a case involving "time outs"). Therefore, Plaintiff has carried her burden here and these two defendants are not entitled to qualified immunity at this stage in the proceedings.

### 4. School Nurse Jean Boggs

██ Plaintiff alleges that the school nurse violated her IDEA rights by not giving her prompt medical attention after the fall. However, under the facts alleged, this was not a violation of Shayne's IEP. It may have been negligent, but it certainly was not a violation of Shayne's IEP. Further, Plaintiff does not specifically allege facts how Ms. Boggs violated her rights in other instances. Plaintiff merely states that Ms. Boggs was "involved." (Am.Compl.¶ 118.) But Plaintiff does not state how Ms. Boggs was involved. Plaintiff's allegations are insufficient as a matter of law. Accordingly, Plaintiff's § 1983 claim is **DISMISSED WITH PREJ-**

---

**7.** Further, and alternatively, Plaintiff has alleged that Cynthia Rose was on specific notice of DPS's use of restraints and grabbing Shayne. (Am.Compl.¶ 108.) Plaintiff also alleges that Ms. Rose acquiesced the pattern of conduct that eventually caused Shayne's injury. (Am.

Compl.¶ 118.) As the Court will explain, these actions were in violation of Shayne's IEP. As such, if these facts are proven, this also would lead a reasonable person to believe that Ms. Rose had violated Shayne's statutory rights.

UDICE AS IT APPLIES TO JEAN BOGGS.

### *Conclusion*

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED IN PART AND DENIED IN PART.** Defendants' motion to dismiss is **GRANTED** with respect to Plaintiff's § 1983 claim against Ms. Boggs. However, Defendants' motion to dismiss is **DENIED IN ALL OTHER RESPECTS.**