**VINTAGE GRAPEVINE, INC., Plaintiff,**

v.

**Charles MARA, d/b/a Mara & Company Wine Marketing, Defendant.**

No. Civ.A. 00–2828.

United States District Court, E.D. Pennsylvania.

June 13, 2001.

Richard M. Beck, Klehr Harrison Harvey Branzburg & Ellers, Julie Holland, Klehr, Harrison, et al, Philadelphia, PA, for Vintage Grapevine, Inc., Plaintiff.

Julie H. Chelius, Montgomery, Mc Cracken, Walker & Rhoads, Richard M. Beck, Klehr Harrison Harvey Branzburg & Ellers, Brendan T. Conway, Montgomery, Mc Cracken, Walker & Rhoads, LLP, Philadelphia, PA, for Charles Mara d/b/a Mara & Company Wine Marketing, Defendant.

Charles Mara, Pound Ridge, NY, Pro se.

**MEMORANDUM**

LOWELL A. REED, Jr., Senior District Judge.

This case of wine puts the aphorism *"in vino, veritas"* to the test. A vintner has sued its former wine marketer and distributor to avoid paying termination fees required by a contract the winemaker claims has aged for too long. The wine marketer has counterclaimed, seeking fees that he claims his former employer has bottled up for illegitimate reasons. Upon a review of the full-bodied record of this case, I conclude that summary judgment is not appropriate, and that the *veritas* of this *vino* action will be tasted at trial.

*Background*

Charles Mara is a marketer and broker of wines, and in 1988, he inked a marketing agreement with Crystal Valley Cellars, Inc., which owned the Cosentino Winery. The agreement was signed on behalf of Crystal Valley by its president, Mitch Cosentino. Mara worked under the agreement for four years promoting the rich aromas and supple tannins of Cosentino Winery wines in the Northeast United States and Georgia in exchange for a commission, and by all accounts he performed admirably. Crystal Valley, however, was not performing particularly admirably, and in 1992, it signed a sales agreement with Vintage Grapevine, Inc., that was primarily intended to bring balance to the financial condition of the Cosentino. Winery. Under the 1992 sale contract, Vintage Grapevine bought out Crystal Valley and took over its operations. The parties agree that little changed, as a practical matter, after the 1992 sale; Cosentino became president of Vintage Grapevine, Inc., which continued to produce Consentino Winery wines, and Mara continued to promote them.

The central issue in this case is the effect the sale of Crystal Valley to Vintage Grapevine had on Mara's 1988 marketing agreement. Was the agreement still in force and binding on Vintage Grapevine after the 1992 sale? The issue fermented for six years, and bubbled up only in 1999 when Vintage Grapevine began removing some territories from Mara. After attempting to have his territories restored, Mara quit and demanded from Vintage Grapevine a termination fee in the amount of two years' worth of commissions. Mara claimed he was entitled to the fee under a clause contained in the 1988 marketing agreement, which he believed was still in force and binding on Vintage Grapevine.

Vintage Grapevine then brought this suit under the Declaratory Judgment Act, 28 U.S.C. § 2201, and plaintiff has counterclaimed for breach of contract. This Court has jurisdiction because the parties are citizens of different states and the amount in controversy exceeds $75,000.

*See* 28 U.S.C. § 1332.[1]

### Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," then a motion for summary judgment must be granted. The proper inquiry on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505.

The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. On a motion for summary judgment, the facts should be reviewed in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

On cross-motions for summary judgment, the court must determine separately on each party's motion whether judgment may be entered in accordance with the summary judgment standard. *See Sobczak v. JC Penny Life Ins. Co.*, 1997 WL 83749, at *1 (E.D.Pa.1997) (citing 10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2720, at 23–25 (2d ed.1983)), *aff'd*, 129 F.3d 1256 (3d Cir.1997).[2]

---

1. I note that it is rather odd that this case, which involves a plaintiff that has its headquarters in Illinois, makes its wine in California, and is incorporated in Delaware, and a defendant who resides in New York, has ended up in this Court in the Eastern District of Pennsylvania. The tenuous connection to Pennsylvania is that Mara marketed wines here, but it appears that he did so for only a short period of time during his tenure with Vintage Grapevine. A motion to transfer venue or dismiss for lack of personal jurisdiction might have sent this case to a more appropriate setting, such as New York, where the contract was drafted and where Mara worked extensively on behalf of Crystal Valley and Vintage Grapevine, or California, where Cosentino signed the agreement. Alas, the potential objections to jurisdiction and venue were waived under Rule 12(h)(1) of the Federal Rules of Civil Procedure.

2. The parties agree that New York law applies to this case, however, because this case involves simple contract interpretation, and because the outcome will be no different under the law of Pennsylvania or New York, I apply the law of Pennsylvania, to the extent that any state law is applied at all here. *See Financial Software Systems, Inc. v. First Union Nat'l Bank*, No. 99–623, 1999 WL 1241088, slip op. at 6 (E.D.Pa. Dec. 16, 1999) ("Where the different laws do not produce different results, courts presume that the law of the forum state shall apply.") (citing *McFadden v. Burton*, 645 F.Supp. 457, 461 (E.D.Pa.1986)); *Denenberg v. American Family Corp.*, 566 F.Supp. 1242, 1251 (E.D.Pa.1983), *superseded*

## Analysis

The outcome of both motions for summary judgment turns on whether Vintage Grapevine can be held to the terms of a contract it did not sign; the 1988 marketing agreement between Mara and Crystal Valley. The contract itself contains few hints. The key clause provides:

> The terms of the Agreement shall be for one year from the date this Agreement is signed. The Agreement shall be automatically renewable on a year to year basis unless cancelled, in which [sic] a two year commission based on the average commission payed [sic] in a year, for setting up the total network, working, promoting, and in general, managing the company in the Northeast and elsewhere.

(Exh. A to Plaintiff's Motion for Summary Judgment, Mara & Company Wine Marketing Agreement, at ¶ 2.) Thus, the agreement had the potential to continue on in perpetuity, until the parties or circumstances cancelled or terminated it. Defendant claims that the sale of Crystal Valley to Vintage Grapevine essentially rendered the contract meaningless, as far as Vintage Grapevine was concerned.

It is undisputed that after the sale, Mara continued to perform for Vintage Grapevine the role he played for Crystal Valley. There was, however, no new agreement, written or oral, that set forth the terms of his relationship with Vintage Grapevine. The parties never specifically clarified Mara's status in the new company with anything but broad generalities.[3] The question, then, is, what was Mara's status under Vintage Grapevine? Was his employment still governed by the contract or was there a new, informal arrangement?

Vintage Grapevine argues that it could not possibly be bound by the 1988 Mara marketing agreement because it was not a party to that agreement, and because the 1992 contract governing the sale of Crystal Valley to Vintage Grapevine contains no mention of the 1988 agreement and excludes contracts and liabilities not explicitly referenced. There is language in the sale contract that might at first blush appear to limit the contracts assumed by Vintage Grapevine to those explicitly listed in the sale contract. A provision of the sale contract provides:

> 4.16 *Contracts.* All contracts, agreements, instruments, plans and leases related to the business or to which the Seller is a party or bound, or by which any of the Purchased Assets are subject or bound, whether formal or informal or oral or written (the contracts), are listed and briefly described on Schedule 4.16 attached hereto. To the best of Seller's knowledge, all Contracts are valid and binding in accordance with their terms and are in full force and effect and no party to any Contract is in breach of any provision of, in violation of, or in default under the terms of any Contract. Seller has provided Buyer with true and complete copies of all written Contracts together with all amendments thereto.

(Exh. 2 to Plaintiff's Response to Defendant's Motion for Summary Judgment, Deposition of Charles Mara, Jan. 4, 2001, at 126–27; Mara Deposition, at 98–102; Plaintiff's Motion for Summary Judgment, Deposition of Mitch Cosentino, Jan. 24, 2001, at 178; Plaintiff's Motion for Summary Judgment, Deposition of Larry Soldinger, Dec. 5, 2000, at 131–134.)

---

*on other grounds as explained in Miniscalco v. Gordon,* 916 F.Supp. 478, 481 (E.D.Pa.1996).

**3.** According to the deposition testimony of Mara, Consentino, and the financial backer of Vintage Grapevine, Larry Soldinger, Mara's role in Vintage Grapevine was the subject of conversations among them in and around the time of the 1992 sale, but the 1988 marketing agreement was not specifically mentioned.

(Exh. 4 to Plaintiff's Response to Defendant's Motion for Summary Judgment, Asset Purchase Agreement, at ¶ 4.16.) The 1988 Mara marketing agreement was not listed on Schedule 4.16, and therefore, Vintage Grapevine argues, it cannot be bound by the contract.

Mara points to language in the "Purchase and Sale of Assets" section, which provides that among the items Vintage Grapevine agreed to purchase were:

(j) All customer files, all lists of customers, suppliers and vendors, all rights and claims under sales contracts, customer orders, *service agreements*, purchase orders, dealer and *distributorship agreements* and other similar commitments;

(k) All of Seller's rights in, to and under the Contracts (as defined in Section 4.16), whether or not listed on Schedule 4.16 ...

(Id. at ¶ 1.2.) Mara claims that this language demonstrates that Vintage Grapevine assumed the 1988 marketing agreement, despite the fact that it was not listed in Schedule 4.16.

▮ I conclude that the only reasonable interpretation of the 1992 sale contract language is that Vintage Grapevine assumed Mara's 1988 marketing agreement.[4] The 1988 marketing agreement unquestionably was a "service agreement" under ¶ 1.2(j); it was an agreement under which Mara provided marketing and promotional services to Vintage Grapevine in exchange for a commission and other consideration. Furthermore, the 1988 marketing agreement falls within the terms of 1.2(k) as a contract not listed on Schedule 4.16. This language appears in the section of the contract that deals specifically with the rights and obligations undertaken by Vintage Grapevine. Thus, under the clear terms of the 1992 sale contract, Vintage Grapevine purchased the rights of Crystal Valley under Mara's 1988 marketing agreement. Of course, Vintage Grapevine cannot have obtained the rights of Crystal Valley under the contract without also assuming its obligations and becoming a full party to the contract; in order to enjoy the benefits of the contract, Vintage Grapevine also was required to perform under the contract. Thus, I conclude that in 1992, Vintage Grapevine became a full party to the 1988 Mara marketing contract and was bound by its terms.[5]

▮ The 1992 sale contract language in paragraph 4.16 referenced by Vintage Grapevine does not persuade me otherwise, because it is not the operative language of the contract. The language appears not in the section that spells out the rights and obligations Vintage Grapevine would assume, but in the "Warranties" section of the contract. The section 4.16 language simply reflects Crystal Valley's promise to Vintage Grapevine that it had "to the best of [its] knowledge" attached in schedule 4.16 and made known to Vintage Grapevine all the contracts related to its business. The paragraph does not say that Vintage Grapevine would not be bound by any contract not listed in schedule 4.16, nor could it; paragraph 1.2(k) clearly states that Vintage Grapevine assumed all Crystal Valley's contracts, "whether or not listed on schedule 4.16."

---

**4.** Because I conclude that the contract language is unambiguous, the interpretation of its terms is a question of law for the Court to decide. *See W.B. v. Matula,* 67 F.3d 484, 497 (3d Cir.1995).

**5.** The parties both advance substantial amounts of parol evidence concerning the meaning of the 1992 sale contract and its impact on the 1988 marketing agreement, but because the 1992 sale contract is integrated and clear in its meaning, such evidence need not—indeed, cannot—be considered.

Paragraph 4.16 simply does not address the question of what rights and obligations were undertaken by Vintage Grapevine, while paragraph 1.2(k) unmistakable addresses that very question. I conclude, then, that the more specific and operative language of paragraph 1.2 controls here, and stand by the foregoing interpretation of that language.[6]

My conclusion does not *ex post facto* shackle Vintage Grapevine to the onerous terms of an obscure agreement of which it had no knowledge. The president of Vintage Grapevine, Mitch Cosentino, signed the marketing agreement with Mara in 1988 when he was president of Crystal Valley and remained well aware of its terms. (Defendant's Motion for Summary Judgment, Deposition of Mitch Cosentino, Jan. 24, 2001, at 99–100.)

Nor is my conclusion that the agreement remained in force inconsistent with the conduct of the parties over the last nine years, as both parties abided by the terms of the agreement from the time Vintage Grapevine took over in 1992 until 1999. Neither party disputes that, consistent with the terms of the agreement, Mara continued to receive the same 15 percent commission that was provided for in the agreement, sold the same line of wines, and continued to work in the territories specified by the agreement. (Exh. 2 to Plaintiff's Response to Defendant's Motion for Summary Judgment, Deposition of Charles Mara, Jan. 4, 2001, at 126–27; Mara Deposition, at 98–102; Plaintiff's Motion for Summary Judgment, Deposition of Mitch Cosentino, Jan. 24, 2001, at 178; Plaintiff's Motion for Summary Judgment, Deposition of Larry Soldinger, Dec. 5, 2000, at 131–134.)

Vintage Grapevine contends that there were differences under the Vintage Grapevine regime, including the expansion of Mara's territories, a flat fee of $1,000 per month from Vintage Grapevine in addition to his commission, the provision of health benefits by Vintage Grapevine, and the institution of new policies and procedures that Mara was required to follow. None of these, however, modifies or contradicts the essential terms of the marketing agreement. The fact that Mara worked in additional states for Vintage Grapevine does not change a thing about the agreement, which identified his territory broadly as

---

**6.** Vintage Grapevine also points to language in the 1992 sale contract that excludes all liabilities "except as expressly set forth" in the contract, and argues that because the Mara marketing contract was not expressly set forth therein. Vintage Grapevine cannot be bound by it. (Exh. 4 to Plaintiff's Response to Defendant's Motion for Summary Judgment, Asset Purchase Agreement, at ¶ 1.4.) Putting aside the question of whether a marketing services contract is defined as an asset or liability, this general exclusion of liability is superseded by the more specified and more applicable terms of paragraphs 1.2(j) and (k), under which Vintage Grapevine agreed to assume service agreements, distributorship agreements, and all other contracts to which Crystal Valley was a party.

Vintage Grapevine also references language in the 1988 marketing agreement that states that the contract "may" be canceled with cause upon "a sale or change of control of the agent company." (Exh. A to Defendant's Motion for Summary Judgment, Mara & Company Wine Marketing Agreement, at ¶ 6.) Vintage Grapevine argues that this language makes it clear that Mara's representation of Crystal Valley would end upon a sale or change in control of the company. I do not read the provision that way. The use of the word "may" instead of "will" or "shall" suggests that there would be no automatic cancellation if Crystal Valley were sold; it was up the parties to effect such a cancellation if they so chose. There is no evidence that the parties chose to cancel the contract and in fact, as discussed above, it is clear from the terms of the 1992 sale contract and from the subsequent conduct of the parties that the 1988 marketing agreement remained in force with Vintage Grapevine assuming the rights and obligations of Crystal Valley.

"Northeast USA and Georgia;" all but one of the additional states were located in the Northeast, and thus were not inconsistent with the agreement.[7] The additional monthly payment of $1,000 does not change the terms of the agreement and presumably reflected the added value of Mara's services over time. The agreement said nothing about health benefits or specific policies and procedures, and thus those have no relevance to the continued vitality of the agreement. Accordingly, I conclude that none of the "new" aspects of the relationship between Mara and Vintage Grapevine indicate that the 1988 marketing agreement was no longer in place.

There is no question that there was a marketing contract between Mara and Crystal Valley, and the under clear language of the 1992 sale contract, Vintage Grapevine assumed the rights and obligations of all of Crystal Valley's contracts, whether or not they were specifically identified. Therefore, I conclude that there was a contract between Mara and Vintage Grapevine.[8]

My next task is to consider whether there was a breach of that contract. Mara claims that Vintage Grapevine constructively canceled the contract by removing most of his territories in 1999. Both parties agree that in December 1999, Mara was informed that because his sales numbers had slipped, his territories would be whittled down to Rhode Island, North Carolina and Georgia. Mara continued to work in those states while requesting permission to return to the other Northeast states. On May 2, 2000, Mara's attorney informed Vintage Grapevine that it had constructively canceled the 1988 marketing agreement and sought termination fees under the agreement.

Neither party appears to dispute, and I conclude, that the December 1999 removal of all but one Northeast state from Mara's territories ran counter to the terms of the marketing agreement, under which Mara was to represent Vintage Grapevine in the "Northeast USA."[9] Vintage Grapevine, however, contends that Mara had already

7. The added states were Pennsylvania, Washington, D.C., and North Carolina. Mara did not initially represent Crystal Valley or Vintage Grapevine in Pennsylvania. In 1995 or 1996, Vintage Grapevine approached Mara about adding Pennsylvania to his territories, to which Mara agreed. He promoted wines in Pennsylvania until 1998, when Vintage Grapevine withdrew Pennsylvania from his territories, a move in which Mara acquiesced. (Exh. C. to Plaintiff's Motion for Summary Judgment, Deposition of Charles Mara, dated Jan. 4, 2001, at 163.) Vintage Grapevine contends that if Mara truly believed the 1988 marketing agreement was binding on Vintage Grapevine, he should have claimed that the agreement was breached when Pennsylvania was withdrawn. However, because Pennsylvania was not one of the states originally contemplated when the agreement was inked in 1988, nor was it a state in which he promoted wines at the outset of the Vintage Grapevine regime in 1992, I cannot infer from Mara's failure to claim a breach of the 1988 marketing agreement when Pennsylva-

nia was removed from his territories that the 1988 marketing agreement was in fact not binding on Vintage Grapevine.

8. Because I conclude that the language of the 1992 sale contract resolves this question, I need not address the parties' arguments concerning assumption of contract obligations, ratification, and estoppel. The parties also present substantial amounts of case law, however, because this case is a simple matter of interpreting clear contractual language, I find it unnecessary to address those cases.

9. The states removed from Mara were New York, New Jersey, Massachusetts, and Connecticut, and the District of Columbia. All but the District of Columbia were part of Mara's contract from the inception of the 1988 marketing agreement. (Defendant's Motion for Summary Judgment, Deposition of Mitch Cosentino, Jan. 24, 2001, at 75.) I conclude that the removal of the states that were at the core of the marketing agreement would be a violation of the agreement. How-

violated the agreement because his performance did not comply with paragraph 4, which provides:

The Agent shall maintain operations in the territory to represent and promote the product within the territory. The Agent agrees it will promote the Product within the territory on a consistent and responsible basis.

(Exh. A to Plaintiff's Motion for Summary Judgment, Mara & Company Wine Marketing Agreement, at ¶ 4.) I conclude that this language is ambiguous and that there is a genuine issue of material fact on this point. There is no dispute that Mara's sales numbers had slipped prior to the withdrawal of his territories, but there also appears to be no dispute that Mara continued his efforts to promote wines on behalf of Vintage Grapevine during the relevant time. The agreement, however, is unclear as to precisely what was required of Mara under its terms, and under what circumstances he would be found in breach of the provisions of paragraph 4. Does the clause requiring Mara promote Cosentino Winery wines "on a consistent and responsible basis" simply demand that he work hard, could those words be interpreted to require him to get certain results? That question is for a jury to decide.

In addition, the facts concerning Mara's performance and his failure to meet agreed-upon sales goals are not fully developed. There is some deposition testimony about Mara's alleged failure to reach sales targets and generally to perform consistent with the expectations of Vintage Grapevine. (Exh. C to Plaintiff's Motion for Summary Judgment, Deposition of Charles Mara, dated Jan. 4, 2001, at 245; Exh. D to Plaintiff's Motion for Summary Judgment, Deposition of Larry Soldinger,

dated Dec. 5, 2000, at 107–08; Exh. E to Plaintiff's Motion for Summary Judgment, Deposition of Mitch Cosentino, dated Jan. 24, 2001, at 204–05). Depending on the jury's interpretation of the ambiguous language of the 1988 marketing agreement, a reasonable jury could conclude from this evidence that Mara in fact failed to perform in a manner contemplated by the agreement. However, the evidence is so scant that, again, depending on the jury's interpretation of the agreement, a reasonable jury could find that Mara's performance did not violate the terms of the agreement.

Because genuine issues of material fact remain, the motions for summary judgment of both parties will fail.

### Conclusion

The *veritas* of this oenological dispute thus remains to be discovered. Having scoured the evidentiary vineyard of this case, I have plucked some genuine issues of material fact that are ripe for trial. While I have concluded that there was indeed a contract between plaintiff and defendant, it remains to be seen whether Mara's marketing agreement was canceled in a manner that entitles him to termination fees under the agreement. Therefore, both motions for summary judgment will be denied. It will be up to the sensitive palate of a jury to decide whether Mara's claim is merely a case of sour grapes.

An appropriate Order follows.

### ORDER

**AND NOW,** on this 12th day of June, 2001, upon consideration of the motion of plaintiff Vintage Grapevine, Inc., for summary judgment (Document No. 16) and the

---

ever, as noted below, there is a genuine issue of material fact as to whether Mara violated the contract first, and thus, my conclusion as to the removal of territories does not end this case.

motion of defendant Charles Mara for summary judgment (Document No. 17), and having considered the pleadings, and evidence on the record pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, **IT IS HEREBY ORDERED** that the motion of plaintiff is **DENIED** and the motion of defendant is **DENIED**.

**IT IS FURTHER ORDERED** that no later than June 30, 2001, the parties shall meet and discuss settlement and provide the Court, in Chambers, with a joint written report of the status of settlement discussions.